No. 13186

IN THE SUPREME COURT OF THE STATE OF MONTANA

1976

---

VITA-RICH DAIRY, INC., a corporation,
and BEATRICE FOODS COMPANY, a corporation,

Petitioners and Appellants,

-vs-

DEPARTMENT OF BUSINESS REGULATION OF THE
STATE OF MONTANA, and BOARD OF MILK CONTROL
OF THE STATE OF MONTANA, a division of the
Department of Business Regulation,

Respondents and Respondents.

---

Appeal from: District Court of the First Judicial District,
            Honorable Peter G. Meloy, Judge presiding.

Counsel of Record:

    For Appellants:

        Burton and Coder, Great Falls, Montana
        Howard C. Burton argued, Great Falls, Montana

    For Respondents:

        Harrison, Loendorf and Poston, Helena, Montana
        James T. Harrison, Jr. argued, Helena, Montana

---

                                Submitted:  June 2, 1976

                                Decided: AUG 16 1976

Filed: AUG 16 1976


_Thomas J. Kearney_
                Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from the denial of a petition for injunctive relief, judicial review, and declaratory judgment by the district court, Lewis & Clark County. Appellants, Vita-Rich Dairy, Inc., Beatrice Foods Co., Clover Leaf Jersey Dairy, Inc., and James R. Hansen d/b/a Hansen's All Star Dairy, were petitioners in the district court. They object to certain paragraphs of rules adopted by the Board of Milk Control (Board), a division of the Department of Business Regulation of the State of Montana. Appellants make three specific objections:

(1) They allege the Board did not have the power to regulate the transportation of fluid milk prior to an amendment to section 27-405, R.C.M. 1947, effective April 7, 1975, and since the rules were adopted and promulgated prior to that date, the entire administrative process must be redone.

(2) The Milk Control Board by regulating the manner of termination of a milk producer's contract destroyed the mutuality of contract between processors and producers and thereby deprived them of their freedom of contract. Appellants also argue that the fact the procedure for a producer to terminate his contract with a processor is different from the procedure for a processor to terminate his contract with a producer constitutes a violation of the equal protection clause.

(3) The rules which require a processor to pay for all milk received from a producer amount to an extra formula milk price increase, were not promulgated with the proper administrative procedure.

This appeal is from an administrative decision. A court reviewing an administrative decision must consider three basic principles in determining what the scope of that review should be:

First, The Court recognizes that limited judicial review

- 2 -

strengthens the administrative process. Limited review encourages the full and complete presentation of evidence to the agency by the participants in the administrative process by penalizing those who attempt to add new evidence or new lines of argument at the judicial review level. A de novo review encourages the participants to save their evidence until it really counts and present it first to the reviewing court rather than to the agency which has the knowledge and experience in the field it regulates. The result is that the agency which has the knowledge and experience in its substantive field does not hear all the evidence, making it difficult to make a proper decision. It also results in the decision being made by a reviewing court which does not have the specialized knowledge or experience in the area. Appellants recognize this in their brief, when they point out:

> "Proceedings before the Board of Milk Control might, to the casual observer, appear to start in the middle and produce only vague testimony. This results from the fact that the <u>members of the Board</u> and nearly all persons appearing before the Board <u>are thoroughly knowledgeable</u> concerning the operation of the milk industry. In consequence, the basics are skipped since it is assumed that everyone involved is aware of them. Some members of the <u>Court may not be so knowledgeable</u> concerning the operation of the milk industry." (Emphasis supplied.)

4 Davis Administrative Law, § 28.21 points out:

> " * * * Experience has now proved that judicial review impairs an administrative program only when the review involves undue substitution of judicial for administrative judgment on problems within the agency's special competence."

<u>Second</u>. Judicial economy requires that the various functions involved in the administrative process must be divided on the basis of comparative abilities and qualifications of each body. Courts are specialists in constitutional issues, statutory interpretation, the requirements of a fair hearing, and the determination that a finding is supported by substantial evidence. The agency is a specialist in the substantive matter

that the legislature delegated to it to regulate.

Third. The agency's actions need a balancing check. In the absence of a body within the agency which is separated from the actual decision and in which all parties have confidence, a limited judicial inquiry to see (a) that a fair procedure was used, (b) that questions of law were properly decided and, (c) that the decision is supported by substantial evidence, is necessary.

It is these principles which underlie the Montana Administrative Procedure Act, section 82-4216, R.C.M. 1947, providing for judicial review of contested cases. However, this section did not narrow the scope of review if the original enacting statute which created the agency provided for broader review.

Section 82-4216(1) provides in pertinent part:

> "This section does not limit utilization of or the scope of judicial review available under other means of review, redress, relief, or trial de novo provided by statute."

The comments to the 1961 Uniform Law Commissioners' Revised Model State Administrative Procedure Act on Section 15(a) [Judicial Review of Contested Cases.] which is identical to section 82-4216(1), R.C.M. 1947, state:

> "An important question that arises under subsection (a) is whether or not the review provisions should be made exclusive and all other review provisions on the statute books should be repealed. Each state will have to deal with this matter as the local circumstances dictate. On the one hand, if there is but one mode and scope of review, the state procedural structure is greatly simplified. On the other hand, local considerations, including practical considerations connected with obtaining adoption of the Model Act, may indicate or even require the retention, at least for the moment, of pre-existing methods of judicial review."

At the time of enactment the Montana legislature left the preexisting judicial review statutes intact. However, the Milk Control Board's review provision, section 27-428, R.C.M. 1947,

was repealed effective July 1, 1975. This appeal was taken prior to that time, therefore section 27-428 applies to this case, allowing for a broader scope of judicial review. The language of section 27-428, R.C.M. 1947, provides the procedure for an appeal to the district court. By inference, the section allows the district court a broader scope of review. The Montana Administrative Procedure Act limits review to the record and allows additional evidence only where need is shown to the court and then allows that evidence to be taken only before the agency. The Milk Board review provisions of section 27-428, R.C.M. 1947, allow evidence to be presented to the court. In this case, however, no additional evidence was taken before the court. The effect, for this case, is that the scope of review is limited to the record, no other evidence having been offered.

Clearly, within the scope of judicial review is appellants' first contention that the Board had no power to regulate the hauling rates charged producers by the processors. This is a matter of statutory interpretation.

The transcript of the hearing held September 10, 1974, before the Milk Control Board explains by testimony the reason the Board was involved in the regulation of hauling rates.

In the middle 1960's "some of the producers got the idea that possibly each time the Board granted the producers an increase, a corresponding raise in the hauling rates ensued * * *." The processor charges the producer for hauling the producer's milk to the processor's plant; this charge is offset against the amount the processor pays the producer for his milk; and, if each price increase granted to the producer is matched by an increase in the amount offset by the processor for hauling, the net effect would be that the producer would

get no increase and the Board would be powerless to set the price paid to producers for their milk. The Board in its next price order (#721, effective May 1, 1972) established this presumption:

> "Any substantial or significant raising of the rates charged producers for hauling their milk from farm-to-plant after the effective date of this official order and without good cause shown, will be presumed to be a dilution of the price to be paid said producers for their Class I milk, and a violation of this official order."

Appellants argue this order and all subsequent orders, including the one before the Court which establishes a statewide uniform method for determining hauling rates, exceed the Board's power.

The section of the Milk Control Act which enumerates the Board's general powers is section 27-405, R.C.M. 1947, which prior to amendment effective April 7, 1975, provided:

> "The Board is hereby vested with the powers, and it shall be its duty to supervise, regulate and control the milk industry of the state of Montana, including the production, transportation, processing, storage, distribution and sale of milk in the state of Montana for consumption within the state * * *."

The amendment, Laws of 1975, Chap. 267, effective April 7, 1975 is entitled:

> "AN ACT CLARIFYING THE AUTHORITY OF THE DEPARTMENT OF BUSINESS REGULATION OVER MILK TRANSPORTATION RATES; AMENDING SECTION 27-405, R.C.M. 1947; AND PROVIDING AN IMMEDIATE EFFECTIVE DATE."

This amendment added this clause after the word "transportation":

> " * * * including transportation rates which distributors, contract haulers, and others charge producers * * *."

Standing alone the statute, even in its pre-amendment form, is clear. The Board has the power to "supervise, regulate and control the milk industry of the state of Montana, including * * * transportation * * *." The 1975 amendment makes express reference to the type of rate regulation in dispute here, to

- 6 -

clarify that the Board had power over these rates.

Appellants argue that a subsequent section of the Milk Control Act clouds the clear mandate of section 27-405, R.C.M. 1947. First, since the statute prior to its 1971 revision included hauling and handling as factors to be considered in setting the price of milk, that once the Board had compensated the producer for hauling costs, the Board was powerless to further regulate hauling rates.

Second, they argue section 27-407(11), R.C.M. 1947, of the Milk Control Act has the effect of removing from the Board the power to regulate farm-to-plant hauling rates. That section provides:

> "No allowance for freight, other than freight for transportation of milk from the farm to plant, shall be charged to a producer by a distributor or dealer unless it is found and ordered by the board, after notice and hearing in the manner hereinbefore specified, that such an additional freight allowance is necessary to permit the movement of milk in the public interest."

Appellants rely on the clause "other than freight for transportation of milk from farm to plant" arguing that this excepts farm-to-plant hauling rates from the Board's power to regulate.

Dealing with appellants' second argument first, this Court has often said in construing legislative intent statutes must be read and considered in their entirety and legislative intent may not be gained from the wording of any particular section or sentence, but only from a consideration of the whole. Home Bldg. & Loan v. Board of Equalization, 141 Mont. 113, 375 P.2d 312; Teamsters v. Cascade Co. School District No. 1, 162 Mont. 277, 280, 511 P.2d 339. On the whole section 27-407(11), R.C.M. 1947, speaks to the procedure and requirements for allowing of interplant hauling charges. It requires that these charges be allowed only after a full hearing and a showing that the interplant movement is in the public interest. The normal

farm-to-plant rates are excepted from the heavy burden of having to make such a showing, but they are not exempt from the power of the Board to regulate.

Before amendment in 1971, the requirement that "hauling, handling" charges be considered in setting the price of milk was replaced by section 27-407(5), R.C.M. 1947, which requires that among the factors to be considered in establishing the milk price formula is:

> "(h) The need, if any, for freight or transportation charges to be deducted by distributors from producer prices for bulk milk * * *."

This section does not require that transportation rates be included in the price of milk, it only requires that the Board consider if a deduction is proper. This section can in no way be construed to prohibit the Board from regulating the rates charged to producers for hauling their milk.

Upon careful examination, we find nothing in the Milk Control Act which in any way limits the power granted in clear and unequivocal terms in section 27-405, R.C.M. 1947, to the Milk Control Board to "supervise, regulate and control the milk industry of this state, including * * * transportation * * *." The Board was within its power to establish rules, as it did here, creating a statewide uniform method of setting hauling rates.

Next, appellants object to these Regulations, Sections 21, 22, 23, of MAC 8-2.12(1)-S1200:

> "(21) Inferior quality or non-compliance with the lawful Regulations of duly constituted health or sanitation agencies shall be reasons for the rejecting of producer milk. In all cases the rejection of the milk must be supported by a statement to the producer setting forth the reason(s) for which the milk was rejected. A copy of said statement must be mailed to the Department.

> "(22) Except for persistent repetition of the cases set forth in paragraph (21) hereof, no

producer's contract or purchasing agreement,
whether express or implied, may be terminated
by a distributor except for cause after notice
and hearing by the Department of Business
Regulation in accordance with the rules and
procedures prescribed by the Montana Adminis-
trative Procedure Act.

"(23) No producer shall terminate his contract
or selling agreement with any distributor except
by giving at least thirty (30) days' WRITTEN
notice to the distributor and to the Department
his intention to terminate; PROVIDED, however,
that nothing herein shall prevent a dealer and
producer from providing by WRITTEN contract or
agreement for a shorter or longer period of
notice, PROVIDED, FURTHER, however, that the
producer must be paid in full by the 15th day
of the month following the month of such termin-
ation."

Appellants object to these regulations on two constitutional grounds. First, these regulations violate the parties "freedom of contract" and second, the different treatment of processors and producers violates the equal protection clause.

This Court held the Milk Control Act to be constitutional in Milk Control Board v. Rehberg, 141 Mont. 149, 376 P.2d 508. There the Court discussed the leading United States Supreme Court milk regulation case, Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.ed 940. In answering a similar equal protection at-tack Nebbia set forth the basic test. It requires that if the legislature has the power to control the area, Rehberg indicates that under Montana law it does, the classification made must not be arbitrary or unreasonable, there must be distinctions which justify the difference of treatment. This test is equally appli-cable whether the legislature or an agency created by the legis-lature makes the classification.

There was testimony before the Board to the effect "in the good old days a fellow with a few cows and a shed barn could go into the production of milk". Today, however, entry into the dairy farming business requires a large investment. Consider-ing the problem before us, there are a number of problems that

the producer faces in order to stay in business. Most producers depend on a single processor who buys all of that producer's milk. If a producer was terminated, the sole source of the revenue needed to recoup his large investment and to provide support for him and his family would be gone. The producers can go to the Board to get protection against the economic catastrophe which would result from termination without cause. The processor who deals with several producers would suffer a good deal less harm when his contract with a producer was terminated than would a producer terminated by the only processor in the area. It would be less difficult for a processor to find another producer than for a producer to find another processor. These are the distinctions which justify the difference in treatment. The evidence before the Board shows the difference in treatment is not arbitrary and is a reasonable distinction.

Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.ed 940, 948, 950, 951, deals with the freedom of contract argument, the Court pointed out:

> "Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest.
>
> " * * *
>
> "The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects State action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and

- 10 -

that the means selected shall have a real and substantial relation to the object sought to be attained.

" * * *

"The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. * * *"

The discussion above shows the rule is reasonable and not arbitrary. The objective of the Board was to minimize the apprehension on the part of producers that they might be terminated without cause and thus to encourage them to remain in the milk production business. The goal of the Milk Board is to maintain a healthy milk industry in Montana. The manner in which the Board seeks to achieve its objective is by providing for a hearing and allowing termination to be for cause only is fair to both parties. The hearing provides the parties a chance to air the controversy and the Board is an impartial expert body, which is ideal for making a fair and knowledgeable decision.

Appellants' last issue is to that regulation which requires them to pay for all fluid milk they receive from the producers. Before the 1971 amendment section 27-403, R.C.M. 1947, required that the processor pay the Class III price for all skim milk "used". The 1971 amendment eliminated this language. The new rules reflect the change. Appellants argue that since they must pay for all milk received and are no longer allowed to deduct a fixed percentage for shrinkage, the milk producer will receive a larger total payment for the milk he supplies the processor. This, they contend, amounts to an extra formula milk price increase not in conformity with the proper administrative procedure, therefore the administrative procedure must be redone.

First, there was no extra formula milk price increase. It is conceded that the rule change here challenged has the same effect as would a milk price increase whether extra formula or

- 11 -

not, it gives the producer more money for his milk. This was not the object of the rule, only an incidental result. The producers sought this rule for two reasons, 1) they felt that their milk is an item of value, 2) they felt if processors had to pay for all milk they receive, they would be more efficient and careful with it than if they did not have to pay for milk they waste.

The parties involved in this appeal received the detailed notice which clearly stated the nature of the proposed rule changes. Counsel for appellants was present at the hearing and argued against the changes and following the hearing submitted a brief to the Milk Control Board opposing the changes. There was no defect in the due process requirement of notice, no surprise, nor any other procedural unfairness which would require that the administrative process be repeated. Appellants knew of the rule changes and their effect and made their objections known to the Board. Based on the evidence before it, the Board decided to promulgate the rules.

There is no constitutional infirmity and no claim that the agency exceeded its statutory authority. This Court finds that a fair procedure was used, and the decision was based on the evidence.

The order of the district court is affirmed.

_____
Justice

We concur:

_____

_____

_____
Justices

_____
Hon. Edward T. Dussault, District
Judge, sitting in place of Mr. Chief
Justice James T. Harrison.

- 12 -