STATE OF MONTANA, Plaintiff and Respondent, v. GERALD
WILLIAM MEADER, Defendant and Appellant.

Submitted March 12, 1979.
Decided Oct. 3, 1979.
Rehearing Denied Nov. 7, 1979.
601 P.2d 386.

John L. Adams, Jr., (argued), Billings, for defendant and appellant.

Mike Greely, Atty. Gen., Allen B. Chronister, Asst. Atty. Gen. (argued), Harold F. Hanser, County Atty., James D. Walen, Deputy County Atty. (argued) for plaintiff and respondent.

MR. CHIEF JUSTICE HASWELL delivered the opinion of the Court.

Defendant, Gerald William Meader, appeals from a conviction in the District Court, Yellowstone County, of two counts of possessing dangerous drugs in violation of section 45-9-102 MCA. Following denial of all Meader's post-conviction motions by the District Court, Meader appeals.

The events leading to defendant's conviction begin on September 19, 1976, when a search warrant was issued to search a house located at 411 Terry Avenue, Billings, Montana. The record indi-

cates that the house on Terry Avenue was being rented by Gerald Meader's girlfriend, Marsha Thill. The grounds for the issuance of the search warrant do not appear in the District Court file nor in the transcript. Defendant does not, however, challenge the validity of the search warrant.

Officer Brennan of the Yellowstone Drug Squad and Officers Sailer, Vogel, Damon, Desmul and Trimarco went to the Terry residence to execute the search warrant at approximately 9:00 p.m. on September 19, 1976. Officers Brennan, Vogel and Trimarco knocked on the front door of the Terry residence and were admitted by Marsha Thill. Officers Sailer, Damon and Desmul entered the residence through the rear door. Upon entering the house, Officer Trimarco observed defendant Meader standing in a bedroom located at the southeast corner of the residence. Officer Trimarco ordered Meader to come out of the bedroom with his hands on his head. Defendant complied, and was then searched for weapons by Officer Brennan. The search of defendant did not produce any weapons or drugs; however, a subsequent search of the southeast bedroom yielded 11½ grams of methamphetamines, four tablets of ascodeen, a man's shaving kit containing 62 hypodermic needles, and various other drug paraphernalia.

After discussing the methamphetamine and drug paraphernalia, the officers placed defendant Meader under arrest for possession of dangerous drugs. He was read his rights and transported to the county jail. Before leaving the residence, Meader exclaimed that Marsha Thill had nothing to do with the drugs found on the premises.

Further search of the premises by the officers uncovered 226 grams of marijuana and extensive drug-related items, including cultivation books, scales, and measuring droppers. The search also revealed a set of personalized license plates bearing the word "Devil" (Meader's nickname), a letter from the Employment Security Division addressed to Meader at "411 Terry Avenue", and various articles of men's clothing and personal effects. All of these items were seized. The officer later explained that they seized these

items to show that defendant had dominion and control over the Terry Avenue residence.

Gerald Meader and Marsha Thill were both charged by information with three counts of criminal possession of dangerous drugs. Count I charged the defendants with criminal possession of 11½ grams of methamphetamines; count II charged them with criminal possession of 226 grams of marijuana; and count III charged them with criminal possession of 4 ascodeen tablets (containing 120 grams of codeine). Defendants initially pled "not guilty" to all charges. Subsequently, they entered a guilty plea to count I of the information, but later withdrew their guilty pleas and entered pleas of "not guilty" to all counts.

The trial in this case was held from September 27 to September 30, 1977. Before submitting the case to the jury, the trial court dismissed count III of the information as to each defendant. The jury found both defendants guilty of counts I and II. Only defendant Meader appeals from the trial court's judgment of conviction on counts I and II.

Defendant raises several issues for our review. He first contends that it was not a crime for anyone to be in possession of nonprescriptive methamphetamines or marijuana on September 19, 1976, because the annual republication of dangerous drugs was not performed by the Department of Health. He next contends that the county attorney improperly charged him with committing two crimes in that contemporaneous possession of anphetamines and marijuana constitutes only one crime under Montana's dangerous drug statutes. His third issue is that the seizure of the personalized plates was illegal, and that the District Court should not have admitted them into evidence. Finally, the defendant contends that the jury verdict is not supported by the evidence.

In discussing the first issue, we must review the provisions of Montana's Dangerous Drug Act.

Addressing the first issue, we observe that section 45-9-102 MCA provides that "a person commits the offense of criminal possession of dangerous drugs if he possesses any dangerous drug, as defined

in section 50-32-101 MCA. Section 50-32-101 MCA states that "Dangerous Drug' means a drug, substance, or immediate precursor in Schedules I through V hereinafter set forth." The actual schedules of dangerous drugs are found in sections 50-32-222, -224, -226, -229, and -232 MCA. The various schedules list specific drugs and substances which the legislature has designated as dangerous. These schedules have remained relatively static since their initial adoption in 1969.

Also included in the Dangerous Drug Act is section 50-32-209 MCA, which states:

"Annual republication of schedules. The board shall revise and the department shall republish the schedules of dangerous drugs annually."

The "Board" referred to in section 50-32-209 MCA is the Board of Pharmacists, and the "Department" is the Montana Department of Health.

■ Defendant contends that the Board and the Department failed to carry out their duties under section 50-32-209. He further contends that this failure to republish and revise had the effect of decriminalizing marijuana and methamphetamines during the period when the Department and the Board neglected to carry out their statutory duties. While it is true and the schedules were not annually revised or republished, we cannot accept the argument that this failure to republish and revise resulted in decriminalization of marijuana and methamphetamines.

■ Defendant's position is based on a strict interpretation of one section of the Dangerous Drug Act—section 45-9-104 MCA. This interpretation would totally defeat the legislative intent behind the enactment of the Dangerous Drug Act. We have consistently stated that "[t]he cardinal principle of statutory construction is that the intent of the legislature is controlling." *Baker National Ins. Agency v. Mont. Dept. of Rev.* (1977), 175 Mont. 9, 571 P.2d 1156, 1160. In construing legislative intent, statutes must be read and considered in their entirety and legislative intent may not be gained from the wording of any one particular section or

sentence, but only from a consideration of the whole. *Vita-Rich Dairy, Inc. v. Dept. of Bus. Reg.* (1976), 170 Mont. 341, 348, 553 P.2d 980. It is our duty to interpret individual sections of an act in such a manner as to insure coordination with the other sections of the act. *Hostetter v. Inland Development Corporation of Mont.* (1977), 172 Mont. 167, 561 P.2d 1323.

Here, the legislature directed the Board to republish the schedules of dangerous drugs annually which the Board failed to do.

However, the Dangerous Drug Act does not indicate that the legislature intended the Board of Pharmacists to have the power, by inaction, to decriminalize the possession of all type of drugs and substances. Rather, we find that the legislature intended the original five schedules to be effective until such time as the Board and the Department took steps to carry out their statutory duties to revise and republish. Thus substances designated in the five schedules could not be legally possessed on September 19, 1976, even though the schedules of dangerous drugs had not been revised or republished. Accordingly, the defendant violated Montana law by having any of those drugs in his possession.

■ In his second issue, defendant argues it was error for the prosecuting attorney to charge him with three counts of possessing dangerous drugs. He contends that possession of different types of prohibited drugs constitutes only one violation of section 45-9-102 MCA, and therefore, that he could only be charged with one count— a single violation of section 45-9-102 MCA.

We note, however, that *State v. Meadors* (1978), 177 Mont. 101, 580 P.2d 903, is directly in point and is dispositive of this issue. In *Meadors*, we held that the legislature intended to provide a distinct crime for each of the drugs listed in schedules I through IV. It was proper, therefore, for the county attorney to charge defendant with three separate counts of possession.

We turn now to the seizure of the personalized license plates. As previously stated, the officers conducting the search of the Terry Avenue residence seized a set of personalized license plates which

bore the word "Devil". These plates were found in plain view, lying on the living room floor. One of the officers conducting the search testified that he had known Gerald Meador since 1972, and knew that Meader used the nickname "Devil". On this basis, the officer seized the license plates and the prosecution introduced the plates as circumstantial evidence tending to show that Gerald Meador had dominion and control over the Terry Avenue residence. They were introduced at trial over defendant's objection.

Defendant claims the license plates were not particularly described in the search warrant, and hence were illegally seized. He also claims the license plates were prejudicial and not relevant to the crimes charged.

The State, on the other hand, argues that the seizure of the license plates was justified under *Warden, Maryland Penitentiary v. Hayden* (1967), 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782; *State v. Quigg* (1970), 155 Mont. 119, 467 P.2d 692; and *State v. Meidinger* (1972), 160 Mont. 310, 318, 502 P.2d 58. In essence, the State argues that police officers can seize "mere evidence" if it has a reasonable nexus to the items described in the search warrant. The reasonable nexus urged by the State is that the license plates were circumstantial evidence which tended to prove defendant's dominion and control over the Terry Avenue residence.

This issue has caused a great deal of confusion in the federal and state courts. In *Marron v. U.S.* (1927), 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed.2d 231, Justice Butler wrote an opinion adopting a strict and uncompromising reading of the Fourth Amendment:

"The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. *As to what is to be taken, nothing is left to the discretion of the officer.*" (Emphasis added.) *Marron*, 275 U.S. at 196, 48 S.Ct. at 76.

The strict approach adopted in *Marron* has been greatly eroded over the ensuing years. Some commentators believe the largest erosion occurred recently in *Hayden*, supra, where the United States

Court stated:

"The requirements of the Fourth Amendment can secure the same protection of privacy whether the search is for 'mere evidence' or the fruits, instrumentalities or contraband . . . between the item to be seized and criminal behavior. Thus in the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in particular apprehension or conviction." 387 U.S. at 306-307, 87 S.Ct. at 1650.

Various state and federal courts have placed great emphasis on the above language in upholding seizures of evidence not described in the warrant.

In *Commonwealth v. Fields* (1974), 2 Mass.App. 679, 319 N.E. 2d 461, police officers obtained a search warrant authorizing them to search an apartment for "certain narcotic drugs, to wit Heroin, and all articles used for the use, sale and preparation of narcotic drugs." When the officers conducted their search, they seized 88 bags of heroin. The officers also seized some gas bills from the top of the defendant's refrigerator. The gas bills were introduced at defendant's trial to establish that the defendant had dominion and control over the premises where the heroin was found. The Massachusetts Supreme Court, in upholding the seizure of the gas bills stated:

"Evidence not described in a valid search warrant but having a nexus with the crime under investigation may be seized at the same time as the material described in the warrant. The test, in the case of 'mere evidence', is whether the item 'will aid in a particular apprehension or conviction.' *Warden, Maryland Penitentiary v. Hayden* (citations omitted). The requisite nexus existed in this case, as the gas bills were relevant for the purpose of showing the defendant's control over the premises." 319 N.E.2d at 463.

Another case favorable to the State's position (i. e. that the license plates were properly seized) is *State v. Turner* (1977), 18 Wash.App. 727, 571 P.2d 955. In *Turner*, the police obtained a search warrant authorizing the seizure of "heroin, controlled substances, related narcotics paraphernalia, records and documents

relating to narcotic sales and dominion and control of the premises." During the ensuing search of defendant's apartment, the officers seized a set of keys which were later used to unlock a footlocker in the basement of defendant's apartment building. At trial, and on appeal, it was conceded that the keys were not specified in the original search warrant, nevertheless, the Court upheld the seizure of the keys:

"Turner first argues the keys were illegally seized. Evidence not described in a warrant, and not constituting contraband or instrumentalities of a crime, may be seized if it will aid in a particular apprehension or conviction, or it has a sufficient nexus with the crime under investigation. *Warden v. Hayden* [cite omitted]; *Commonwealth v. Fields* [cite omitted]; see also *United States v. Jones*, 518 F.2d 384, (7th Cir. 1974), cert. denied, 423 U.S. 997, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975). The nexus in this case was twofold: the keys not only identified and opened the locker, but also circumstantially proved that their owner had dominion and control over the contents therein." *State v. Turner*, 571 P.2d at 957.

A third case which supports the State's position is *United States v. Jones* (7th Cir. 1974), 518 F.2d 384, cert. den. 423 U.S.997, 96 S.Ct. 426, 46 L.Ed.2d 371. In *Jones*, the officers were authorized by a warrant to seize "heroin and all narcotic paraphernalia (hypodermic needles)." In conducting the search, they failed to find any drugs but they did find a piece of paper containing the name and unlisted telephone number of a federal narcotics agent.

The appellate court held that "the slip of paper with Agent Scotti's name and unlisted home number was in the nature of both an instrumentality of crime and evidence reasonably connected to the alleged criminal behavior under investigation." *Jones*, 518 F.2d at 389. Thus the Court held that the officers were correct in seizing the slip of paper, even though it was not described by the warrant.

The first Montana case in this area is *State v. Quigg*, supra. In *Quigg*, officers obtained a search warrant authorizing the seizure of "[a]ny .22 caliber pistol, a gold wristwatch with expansion band

*or any other property or evidence they might discover that may connect to the demise of Lee Robbins."* During the search of Quigg's residence, the officers discovered various items related to guns, particularly .22 caliber armament. They also discovered thirteen tablets which were "purportedly" in the deceased's possession at the time of his death. Quigg argued that the gun and the pills should have been suppressed because they had not been described with the requisite particulars of "make, serial number, or other identifiable features".

This Court held that the items were properly seized and admissible as evidence:

"That *items or things other than those described in the warrant* may be seized is clear so long as a reasonable relationship between the search authorized by the warrant is demonstrated. *State v. Pietraszewski*, 285 Minn. 212, 172 N.W.2d 758 (1969), and see discussion in *Gurleski v. United States*, 5 Cir., 405 F.2d 253. Here we have the gun box, identified by serial number with the murder weapon, which had been described in general terms by the widow as being kept in the automobile of the deceased. As to the pills—the facts as to the rifling of the drug supplies in the automobile which belonged to the deceased, a drug salesman know to distribute Rorer company products, and other matters, make for the reasonable relationship between them and the item sought, the missing weapon. *Thus, the two items seized are not seized as a direct result of the description of items described on the search warrant, but rather as a result of the lawful right to search and their reasonable relationship to the crime involved and the items authorized to be searched for.*

"The facts that the warrant went on to describe 'any other property or evidence they might discover that may connect to the demise of Lee Robbins' does not, in our view, change the character of an otherwise valid search warrant to an invalid one." *Quigg*, 155 Mont. at 132 & 133, 467 P.2d at 699.

This Court has cited the *Quigg* decision for the proposition that "given a lawful search, some things may be seized in connection

therewith *which are not described in the warrant."* *Meidinger*, supra.

In the present case, the drug enforcement obtained a search warrant for the Terry Avenue residence in hopes of finding illegal drugs on the premises. The actual search turned up large quantities of contraband and defendants Marsha Thill and Meader were arrested for violations of section 45-9-102 MCA. The officers, apparently anticipating problems in showing that Meader had dominion and control over the residence, seized two additional items which they felt would bolster the prosecution drug case against Meador. Specifically, the officers seized two license plates bearing defendant's nickname "Devil" and a letter addressed to Meader at "411 Terry Avenue". We find that these two items bear a reasonable relationship to the search authorized by the warrant. Accordingly, under *Quigg* and *Meidinger*, the seizure of the license plates and the letter was permissible. Additionally, the items were properly admitted as evidence tending to show defendant's dominion and control over the Terry Avenue residence.

Defendant's final issue concerns the sufficiency of the evidence to support his conviction. He places great reliance on the fact that the Terry premises were leased in Thill's name, and that he was not in physical possession of any drugs when the officers searched him. Defendant believes these two facts made it impossible for the jury to convict him for possession. We cannot however, ignore the remaining evidence.

Even though defendant did not have dangerous drugs on his person, his culpability is not thereby eliminated. .Possession of dangerous drugs may be either "actual or constructive". *State v. Trowbridge* (1971), 157 Mont. 527, 487 P.2d 530; *State ex rel. Galyon v. District Court* (1971), 156 Mont. 523, 480 P.2d 840. "Actual possession means that the goods [drugs] are in the personal custody of the person charged with possession; whereas, constructive possession means that the goods are not in actual, physical possession but that the person charged with possession has *dominion and control* over the goods". *State v. Callahan* (1969), 77

Wash.2d 27, 459 P.2d 400, 401-402. (Cited with approval in *Trowbridge*.)

"Constructive possession occurs when the accused maintains control or a right to control the contraband; possession may be imputed when the contraband is found in a place which is immediately and exclusively accessible to the accused and subject to his dominion and control, *or to the joint dominion and control of the accused and another.*" *People v. Williams* (1971), 95 Cal.Rptr. 530, 485 P.2d 1146, 1148

The validity of defendant's conviction rests on whether there was sufficient evidence for the jury to find that he had constructive possession of the drugs (i. e. dominion and control over them). This determination is a question of fact to be determined by the jury.

We find ample evidence to support the jury's finding that defendant had actual dominion and control over the Terry Avenue residence. Defendant was physically present in the house when the search was conducted. Defendant was actually found hiding in the bedroom where the methamphetamines were discovered. Mail addressed to defendant at "411 Terry Avenue" was found in the living room of the home. Additionally, license plates bearing defendant's nickname and men's clothing which would fit the defendant were found in the home. It was also established that the landlady believed that defendant was occupying the Terry Avenue address. We note here that defendant objected only to the admission of the license plates.

Although some of these items were explained to some degree by the defendant's witnesses, they remained questions of fact for the jury. On appeal, the Court views the evidence in a light more favorable to the State, the prevailing party in the District Court. *State v. Pascgo* (1977), 173 Mont. 121, 566 P.2d 802, 805. If the circumstances reasonably justify the verdict, this Court must assume the existence of every fact which the jury could have reasonably deduced from all the evidence. *State v. Steward* (1968), 151 Mont. 551, 556-557, 445 P.2d 741. There was ample evidence for the jury to determine that defendant had dominion and control

over the Terry residence, and thus, to find that defendant had constructive possession of drugs.

Affirmed.

MR. JUSTICES DALY, HARRISON and SHEEHY concur.

MR. JUSTICE SHEA concurring.

I concur in the decision affirming the conviction. As to the scope of the search warrant, the defendant objected only to the seizure of the license plates. Moreover, under the case relied on by the majority, the license plates and letter were properly seized. I stress, however, that if the issue had been raised concerning the right of privacy, it could well be that seizure of the items beyond those described in the search warrant, would have violated defendant's right of privacy under the 1972 Mont.Const., Art. II, § 10.

Applying the standards of search and seizure without regard to a consideration of the right of privacy, it does appear that the seizures here fell within the ambit of *Warden, Maryland Penitentiary v. Hayden* (1967), 387 U.S. 294, 87 S.Ct. 1642, 18 L.E.2d 782; and *State v. Quigg* (1970). 155 Mont. 119, 467 P.2d 692; and *State v. Meidinger* (1972), 160 Mont. 310, 318, 502 P.2d 58. I stress, however, that *Warden* need not apply to searches and seizures under state law if this Court sees fit to adopt a more strict standard in construing our own Constitution. Moreover, both *Quigg* and *Meidinger* were decided before our new "righty of privacy" provision went into effect under the 1972 Constitution.

The "right of privacy" is not preserved, if, under the authority of a search warrant, a law officer seizes items beyond those particularly described in the search warrant. Before explaining my reasons, I must first mention the state of the record in this appeal. The application for search warrant and the search warrant were not forwarded to this Court. I am at a loss to understand why the parties did not see to it that this Court had these documents. For this reason, I must take some liberty with what I think these documents would reveal if they were part of the record.

For purposes of my discussion, I assume that the application for

search warrant and search warrant were worded in the customary fashion as to the scope of the permitted search. Since *Hayden*, and then *Quigg* and *Meidinger*, the customary practice is for the search warrant to contain, in addition to an order permitting the search for and seizure of the items particularly described in the search warrant, an additional order which permits the search for and seizure of such items which fall into the category of "any other contraband", "fruits or instrumentalities of the crime", and "any additional evidence that may tend to connect the defendant to the commission of the crime." A particular search warrant may not contain all of this language, but typically there is some variation of it which appears in most warrants. Undoubtedly, the inclusion of this language in search warrants has been spawned by *Hayden* and its progeny.

Such language in a search warrant creates an automatic expansion of the search warrant from a search for particular items described in the search warrant to a more general search. A right is given, indeed, an order is given, for the law officers to seize nondescribed evidence which they deem to be somehow connected to the crime. The result is that judicial approval is obtained to conduct a general exploratory search under the literal language of the search warrant itself. Practically speaking, the effect is that more often than not, evidence is seized which has not been described in the search warrant. The searches are invariably broader than if the search was confined to the items described in the search warrant. Should the scope of the search later be called into question, the officers merely fall back on the language of the warrant itself which created the authority for them to search for more than the items described. In effect, a permissive seizure made in good faith under the authority of *Hayden* and *Quigg*, is converted by law enforcement and the issuing courts, into a command to seize more evidence than that particularly described in the search warrant. General exploratory searches, call them by whatever other name you will, are the inevitable result.

Practically speaking, the case is rare when a seizure beyond those

items described in the search warrant, is dictated by the exigencies of the situation. In the present case, for example, the State could easily have secured the premises and reapplied for a search warrant authorizing them to seize the license plates and the mail addressed to the defendant. Here, both the defendant and the woman were arrested practically on the spot. There was, therefore, no danger that additional evidence would disappear before it could be seized pursuant to another properly issued search warrant. Indeed, in most cases, the additional evidence can be seized by simply securing the premises and applying for another search warrant.

My reason, however, for not permitting additional seizure language in a search warrant is not confined to my belief that such language serves as an incitement to convert a specific search into a general exploratory search. An additional reason is that if the right of privacy under Montana's constitution is to have any meaning at all within the contest of a search and seizure, the balance is clearly tipped in favor of prohibiting the inclusion of such seizure language in a search warrant. To go beyond seizures of those items particularly described in the search warrant, I believe the State must demonstrate a "compelling state interest" (1972) Mont. Const., Art. II, § 10), and this the State cannot do.

If evidence is seized without probable cause, whether it is described in the search warrant, or seized as "mere evidence", it is true that the evidence cannot be used. The quote from *Hayden* in the majority opinion indicates that the United States Supreme Court believes that the probable cause requirement of the Fourth Amendment are sufficient to protect the right to privacy, even when the search is for "mere evidence." But there is no specific provision of the United States Constitution which explicitly guarantees the right to privacy. In this State, on the other hand, 1972 Mont. Const., Art. II, § 10, expressly guarantees the "right of privacy" which can be overcome only by the showing of a "compelling state interest." The function of the search warrant has been served when, upon probable cause, the items specifically described in the search warrant are seized, or when the search has been un-

dertaken for the specific items, but has produced no tangible results.

In this State, if evidence is seized in violation of one's right of privacy, it cannot be used. But the "right of privacy" provision does not exist solely to prevent the use of evidence seized in violation of that right. It exists also as a preventative measure, to assure (or help assure) that the right of privacy will not be violated in the first instance. If it is to serve this function in the context of searches and seizures, there clearly is no "compelling state interest" to seize evidence other than what is particularly described in the search warrant. But if there is such a seizure, the right of privacy protection guaranteed by 1972 Mont.Const. Art. II, § 10, should stand as a bar to use of the evidence.