No. 82-175

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

_____

THE MONTANA POWER COMPANY,

                              Plaintiff and Appellant,

        vs.

DEPARTMENT OF PUBLIC SERVICE
REGULATION, MONTANA PUBLIC SERVICE
COMMISSION et al.,

                              Defendants and Respondents.

_____

Appeal from:  District Court of the Second Judicial District,
              In and for the County of Silver Bow
              Honorable Mark Sullivan, Judge presiding.

Counsel of Record:

    For Appellant:

        Crowley, Haughey, Hanson, Toole and Dietrich,
         Billings, Montana
        George C. Dalthorp argued, Billings, Montana
        Corette, Smith, Pohlman and Allen, Butte, Montana
        Hjort, Lopach and Tippy, Helena, Montana

    For Respondents:

        James C. Paine argued, Helena, Montana
        Eileen E.Shore argued, Helena, Montana

_____

                    Submitted:  March 1, 1983

                      Decided:  May 31, 1983

Filed: MAY 31 1983

_____
                    Clerk

Honorable James B. Wheelis, District Judge, delivered the Opinion of the Court.

Montana Power Company (MPC) appeals from a judgment entered in the Silver Bow County District Court, the Honorable Mark P. Sullivan presiding, affirming an order of the Public Service Commission (PSC) which set allowable electric rates.

In April 1980 MPC filed an application for electric rate increases with the PSC. In its request MPC asked the PSC to accept, as a part of the rate base, money expended by the company in obtaining coal from Western Energy Company (Western Energy). Western Energy is MPC's wholly-owned subsidiary and supplies 100 percent of the coal need for MPC's coal-fired generators in Colstrip and Billings. MPC accounts for approximately 15 percent of Western Energy's annual coal sales with the remaining 85 percent of sales being made to other utilities and manufacturing concerns.

During the hearing on the rate increase request, the PSC heard testimony on two different methods for monitoring the reasonableness of the price MPC pays for its coal. First, MPC suggested the use of the "market price" method: an examination of the price charged in the marketplace for similar sales in comparison to those being charged by the subsidiary to the parent; if a favorable comparison is found, the price is deemed reasonable and no adjustment is necessary. Second, the Montana Consumer Counsel suggested the "rate of return" method, which called for an examination of the return being earned by the subsidiary on its sales to the parent; an excessive rate of return requires an adjustment.

In support of the "market price" method, MPC submitted

a study prepared by Arthur D. Little, Inc., a firm of national prominence in the field of coal supply contracts. MPC requested Arthur D. Little, Inc., to solicit and evaluate bids from coal suppliers. After receiving bids from nine companies, Arthur D. Little, Inc., found that Western Energy's price was the lowest price available to MPC's Billings plant. The Colstrip plants were not included in the study because the existing contracts had not expired.

In support of the "rate of return" method, the Consumer Counsel's expert witness, John W. Wilson, presented evidence that compared Western Energy's profits with those of other coal companies. Wilson's approach characterized Western Energy's profitability of more than 20 percent on equity capital as excessive when computed to the 13.5 percent average for the other coal companies used in his comparison.

In December 1980, after analyzing the evidence presented, the PSC chose to rely on the "rate of return" method suggested by the Consumer Counsel and rejected the "market price" method suggested by MPC. The PSC found 13.5 percent to be a reasonable rate of return on coal sold by Western Energy to MPC and ordered $900,730 of MPC's request be disallowed.

An appeal of the PSC order was taken to the District Court by MPC. After review, the court held that: (1) the evidence presented to the PSC showed that the rate of return established by the PSC compares closely to other coal companies; (2) MPC offered no substitute for what it thought the return figure should be, nor did it offer any evidence to support a higher rate of return; (3) MPC, in its rebuttal

-3-

of Consumer Counsel's witness Wilson, offered no evidence that Wilson's comparable coal industry earnings exhibit was faulty; and, (4) MPC did not sustain its burden of proof as to the order of the PSC being unlawful or unreasonable.

MPC now appeals to this Court claiming that: (1) the PSC failed to give effect to the decision in Montana-Dakota Utilities Co. v. Bollinger (1981), ____ Mont. ____, 632 P.2d 1086, 38 St.Rep. 1221; (2) the PSC and the District Court erred by ignoring MPC's substantial evidence which demonstrated that Western Energy's coal price was the lowest available coal price under competitive market conditions; and, (3) the Montana Consumer Counsel's evidence which the PSC adopted in imposing a rate of return limitation on Western Energy's profitability is inherently flawed.

Appellant MPC contends that the PSC should not have used the "rate of return" method because a competitive market was shown to exist and Western Energy's coal was the lowest priced coal available to MPC. It asserts the cost claimed by MPC should not have been deemed excessive.

Respondent contends that the use of the 13.5 percent profitability average was not improper. The interest of the PSC is to see that MPC does not reap an unfair profit on its investment in its subsidiary by allowing the subsidiary to overcharge the parent for coal when the coal expense will be passed on to the ratepayers.

A very similar situation was presented to this Court in Montana-Dakota Utilities Co. v. Bollinger (1981), ____ Mont. ____, 632 P.2d 1086, 38 St.Rep. 1221. Montana-Dakota Utilities Co. (MDU) had requested an increase of its electric utility rates. In its request, MDU asked the PSC to

accept, as part of the rate base, money expended by the company in obtaining coal from Knife River Coal Company (Knife River), a wholly-owned subsidiary of MDU. The PSC used a "rate of return" method to reduce the return on investment from approximately 33 percent to 12.124 percent (the rate of return allowed to MDU on its overall operation).

Apparently, MPC has misunderstood our decision to remand Montana-Dakota Utilities to the PSC. MPC would interpret our decision to hold that, once a competitive marketplace is established, the "market price" method must be used by the PSC. We did not so hold. We remanded that case to the PSC, not because the PSC chose to use the "rate of return" method, but rather because the PSC did so without sufficient evidence to support its findings. Montana-Dakota Utilities, 632 P.2d at 1091, 38 St.Rep. at 1227.

We did state a preference for "the PSC to use a marketplace cost of coal approach, if it can obtain sufficient facts for its determination, rather than using the rate of return method with all of its difficult theories and computations." Montana-Dakota Utilities, 632 P.2d at 1092, 38 St.Rep. at 1228. It was, however, recognized that the PSC has the right to choose the method followed. The PSC should not be restricted to any single formula so long as the method followed and the order entered when applied to the facts and viewed as a whole do not produce an unjust or abitrary result. 632 P.2d at 1091, 38 St.Rep. at 1227.

The PSC is vested, by statute, with the duty to supervise and regulate the operations of public utilities and to see that rates are just and reasonable. Section 69-3-330,

MCA. This Court cannot substitute its judgment for that of the PSC. Our function is to determine whether the PSC acted arbitrarily and unreasonably without sufficient evidence to support its findings. Mountain States Telephone & Telegraph v. Dept. of Public Service Regulation (1981), ____ Mont. ____, 624 P.2d 481, 38 St.Rep. 165.

In Montana-Dakota Utilities we remanded the case to the PSC with instructions to:

> ". . . hold an additional hearing to determine the following: (1) if rate of return is used, a factual basis for the rate of return allowed Knife River considering its assets and rate of return on a marketplace basis comparable to other coal companies; or (2) in the event market cost of coal is used, sufficient facts to support the PSC determination of the fair market price for coal." 632 P.2d at 1092, 38 St.Rep. at 1228.

We did not hold that the PSC must use a "market price" method if a competitive marketplace can be established; the choice of methods is left to the PSC.

In the instant case, the PSC chose to apply a "rate of return" method in an effort to determine the reasonableness of the price paid by MPC for Western Energy coal. Our inquiry is limited to determining whether substantial evidence was presented to support the PSC's decision or if the decision was unjust or arbitrary.

On appeal, MPC contends the PSC's reliance upon the testimony of Montana Consumer Counsel witness John W. Wilson is erroneous. MPC claims Wilson's study is not an accurate study of the entire industry. Wilson found Western Energy earned a 20 percent return on equity capital every year since 1974. Wilson testified that the industry average equals 13.5 percent. MPC now claims Wilson collected arbi-

-6-

trary data which does not accurately reflect the coal industry. In its rebuttal testimony at the PSC hearing, however, MPC did not challenge the accuracy or probative value of that testimony. MPC, in rebuttal, merely reasserted its original position that the PSC should rely on MPC's testimony. No foundation objections were made by MPC concerning the exhibits used by Wilson.

MPC is essentially challenging Wilson's testimony for the first time on appeal. The MPC is offering this Court an invitation to judge the credibility and weight of factual evidence which is not part of the record which MPC itself ignored, overlooked, or misinterpreted at the administrative level--the PSC hearing. This we will not do. This Court has previously recognized that limited judicial review strengthens the administrative process. "Limited review encourages the full and complete presentation of evidence to the agency by the participants in the administrative process by penalizing those who attempt to add new evidence or new lines of argument at the judicial review level." Vita-Rich Dairy, Inc. v. Dept. of Business Regulation (1976), 170 Mont. 341, 343-344, 553 p.2d 980, 982.

It is an axiom of utility law that a utility seeking increased rates has the burden of showing its claims are reasonable. The MPC did not object to the foundation of the Consumer Counsel's witness's exhibit. The PSC was entitled to believe and accept the evidence as presented by the Consumer Counsel's witness and to reject the evidence presented by MPC. So long as the record supports the decision, that judgment must stand. It is not required that a person be knocked down by a gale before he knows which way the wind is

blowing. All that is required is that the evidence is capable of being believed. In the instant case, unlike Montana-Dakota Utilities Co. v. Bollinger, supra, the record supports the decision made by the PSC. There was ample evidence presented by Consumer Counsel's witness John W. Wilson that Western Energy profitability (20 percent) was above that of the average for the industry (13.5 percent). The PSC chose to make the necessary adjustments in the amount that MPC was allowed to pass on to the ratepayers.

MPC cannot wait until appeal to challenge the evidence and testimony of the Consumer Counsel. MPC did not sustain its burden of proof as to the order of the PSC being unlawful or unreasonable.

We hold that the PSC's decision is supported by substantial evidence and fully meets the standards and guidelines established in Montana-Dakota Utilities Co. v. Bollinger, supra.

Affirmed.

_____
Honorable James B. Wheelis,
District Judge, sitting in
place of Mr. Justice Daniel
J. Shea

We concur:

_____
Chief Justice

_____

-8-

_____

_____

_____
                Justices

_____
Honorable Byron L. Robb, Dis-
trict Judge, sitting in place
of Mr. Justice John C. Sheehy

Mr. Justice John Conway Harrison dissenting.

I dissent.

I have tried in vain to reason with my colleagues not to make what I view to be a further confusion in the law of utility regulation in the State of Montana. The result of the majority holding will, in my opinion, not only increase the cost of electricity to the consumers of Montana, but, in addition, increase the cost of coal to purchasers of Western energy -- which will in turn be passed on to the consumers. The economic result of the majority holding will force Montana Power to purchase its coal from more expensive sources and sell the 15 percent it contracted for with Western Energy to a better market. To so hold does not, in my opinion, make economic sense.

Taking the uncontroverted facts presented to us, it is evident that Montana Power Company (MPC) studied our opinion in Montana-Dakota Utilities Co. v. Bollinger (1981), ____ Mont. ____, 632 P.2d 1086, 38 St.Rep. 1221, and decided that in cases where coal is purchased from a wholly-owned subsidiary, the steps necessary to make the purchase would be carefully adhered to, and that the holding of that opinion was controlling as to the proper method to be used by the Public Service Commission (PSC) in determining the methodology to be used. I believe the PSC misread our holding in arguing that we held in Bollinger (supra) that the "marketplace price of the coal" was controlling. What we held was:

> "'As a matter of justice, it appears to the court that it might be better for the PSC to use the marketplace cost of coal approach, if it can obtain sufficient facts for its determination, rather than using the rate of return method with all its difficult theories and computations. While the PSC does have the right to choose the method followed, this court did not find a factual reason for the summary rejection of the marketplace cost of coal approach.'" (emphasis added)

> "We therefore, vacate the judgment of the District Court and remand the case to the PSC with instructions to hold additional hearings to determine the following: (1) if the rate of return is used, a factual for the rate of

-10-

return allowed <u>Knife River</u> considering its assets
and rate of return on a marketplace basis
comparable to other coal companies; or in
the event market cost of coal is used, sufficient
facts to support the PSC determination of
the fair market price for coal.'"

While we did indicate by our language in <u>Bollinger</u> (supra)

that is our opinion the "market price might be the better approach,"

we did not rule out the use of other methodology by the PSC. We

noted that a parent's earnings in a subsidiary are improper if the

utility earns "excessive profits" at the expense of the ratepayer.

We further held that sales to other customers and "evidence of

prices charged by other companies in the competitive area" are

sufficient to establish the reasonableness of coal prices.

Perhaps it was this latter language that caused the MPC to

follow the market price approach in its presentation to the PSC

believing, on the basis of <u>Knife River</u> case, that if such an approach

was taken, their evidence would be so convincing the PSC would be

found to be arbitrary if it arrived at a different holding. In

my view, the evidence for the rate of return method was so weak

this case should be reversed.

It is apparent MPC believed that our holding in <u>Knife River</u>

stated that it was preferable to use the market price method

because the record indicates that the company was aware that the

PSC had expressed concern regarding the "captive coal" situation

of Montana Electric Utilities. Therefore, MPC retained an independent

firm, knowledgeable in the areas of coal supply and contracts,

to secure for the Corette Plant at the lowest possible cost, a

fuel supply that was available at the time when the existing contract

was expiring. The appellant company specifically informed the

PSC by letter of its intention to do so. Thereafter, they secured

the services of an Arthur D. Little, Inc., who solicited some sixteen

coal companies operating in the Montana and Wyoming area for bids

for coal supply to the Corette Plant. An advertisement was

placed in <u>Coal Week</u>, a coal industry publication, and this advertise-

ment produced five additional requests for that information. Nine

bids were eventually received.

An analysis of the bid showed that the prices as of September 1, 1979, including transportation and utilitization costs, for the three lowest bids were as follows: Western Energy (Rosebud Mine), 0.753 per million BTU; Westmoreland Resources, Absarokee (Absaloka Mine), 0.897 per million BTU; ARCO (Black Thunder Mine), 0.921 per million BTU. The remaining six bids ranged from 0.993 to 1.346 per million BTU. It is interesting to note that Westmoreland's Absaloka Mine is closer to the Corette Plant than the lowest Western Energy's Rosebud mine.

An additional factor considered by Montana Power was its desire to secure the coal supply for a ten-year period, and further analysis was required to determine how escalation clauses and increased transportation clauses would effect the contract prices over the ten-year period. The result of the analysis described by the independent reporter, Arthur Little, was that the cost levelized over a full contract period thus Mr. Little calculated a $0.40 per million BTU cost advantage for the Western Energy Coal.

I find the Arthur D. Little report to be objective and conclusive evidence that competition existed, and that Western Energy appropriately received a contract as a result of its favorable contract offer. I also find that the evidence is unchallenged and should have formed the basis for the PSC's determination to recognize the appellant's Western Energy Coal purchase expense as fully recoverable.

The Arthur D. Little study does not include the coal supply for Colstrip's Units I and II because that contract at that time had expired. There was testimony on the record that the Colstrip contract was negotiated jointly with Western Energy by the Puget Sound Power and Light Company and the MPC, as partners in Colstrip I and II. The price paid for that coal was subsequently recognized in Puget Sound's electrical rates, and therefore, Puget Sound negotiated with knowledge that its fuel expenses would be scrutinized

-12-

by its home state, Washington, regulators. In Washington, Puget Sound sought a price which it could later justify. As previously noted, Washington approved Puget Sound's coal purchases from Western Energy.

The cost of the appellant Montana Power and Puget Sound for Colstrip is substantially below the competitive price at the Corette Plant, even before transportation and other expenses are considered. The Colstrip cost of $7.097 per ton compares favorably with the $8.757 Corette cost. This comparison, made for the purpose of independently verifying the reasonableness of the Colstrip Cost level, is, in my opinion, one of the strong points for Montana Power's position that it's claimed level of coal expense is fair to the Montana Power ratepayers. In addition, the record indicates, through the testimony of Mr. Burke, that Montana Power coal expense at Colstrip I and II, as well as at Billings, had been accepted by the PSC in previous hearings in 1968, 1972, 1975, and 1978, as a result of rate proceedings in those years. Such facts are, in my opinion, indicative of the coal price at Colstrip. It is interesting to note that in those previous hearings regarding Pacific Power and Light, the expert of the Consumer Counsel, Dr. Wilson, was examined on the theory that he presented in this case by the consumer counsel and by the PSC, and in those instances the PSC did not accept his testimony. With this background, it is understandable that the appellant, MPC, choose not to cross-examine him because in those four cases the PSC had found his testimony unreliable or at least unconvincing. As it is above noted, Dr. Wilson has for some time been trying to sell the rate-of-return methodology as an expert witness here in Montana, and we noted in Knife River, supra, that such a method could be acceptable so long as the method did not produce "an unjust or arbitrary result" and that the reasonableness of the coal purchase expenses be based on "sufficient evidence." The PSC argues since MPC did not challenge the testimony of J.W. Wilson it gave them license to adopt that testimony without even

superficial scrutiny. Then the PSC asserts that their "substantial evidence" rule applied so the court cannot substitute its judgment for that of the PSC.

I do not agree with that in view of the fact that there is, in my opinion, an arbitrary, capricious decision made by the PSC in adopting the testimony of J.W. Wilson. Dr. Wilson is the only witness that testified concerning the issue of earnings of other coal companies. This testimony is as follows:

"As shown on page one of exhibit 22, (JW-3), the coal industry equity profits have averaged about 16 percent in this decade, with the exception of very high earnings rates in the three years immediately following the OPEC embargo. In November of 1973, the average earnings rates in the coal industry have been under 12 percent."

He thereafter listed eight coal companies as "comparable coal industry earnings from 1970-1979." Those companies were Bates Manufacturing, Eastern Gas and Fuel, Fulcom Seaboard, Kaiser Resources, Kaneb Services, North American Coal, Pittstown and Westmoreland Coal. As previously noted, the appellant, MPC, had contacted twenty-one coal companies in connection with the Corette coal contract that there was only one of the companies contacted by Montana Power on both lists, that is "Westmoreland." Even that is not a sufficient identity for the same company is listed on the Arthur Little, Inc. report as "Westmoreland Resources, Inc." which operates a mine in Big Horn County, Montana. All of the sixteen companies solicited by Arthur D. Little, Inc., were producing coal in Montana and Wyoming. None of the companies, except Westmoreland, if that is the same Westmoreland as the Westmoreland Resources, are listed as solicited by Arthur D. Little, are within the area of Montana and Wyoming.

In comparing the testimony of Arthur D. Little, Inc., and Wilson, there appears to be inadequacies on the part of Dr. Wilson that should have drawn more attention from the PSC in evaluating his testimony. 1. According to Dr. Wilson, the

-14-

Fulcom Seaboard showed a percentage of earnings from 1974 - 1978 averaging 30.8 percent, which far exceeds Western Energy's average for those five years by as much as 7.8 percent per year. In addition, Fulcom Seaboard's figure for 1979 was not used by Wilson and, therefore, it had no input into the 13.5 percent earning figure which PSC was going to allow Western Energy.
2. Next, the company given by Wilson called "Bates Manufacturing" was liquidated by 1979, and therefore has not had any impact on the "average" 13.1 percent selected by Wilson with a slight modification adopted by the Commission. 3. Wilson listed as an "average" number at the base of each column of his exhibit. This actually is an average of the averages of each company, and does not take into consideration any proper variables. This cannot be, in my opinion, a true average. Further, in distorting the figure, he left out Fulcom Seaboard, which was an unusually low figure and inserted in its place Westmoreland Coal (1 percent) and Pittstown (8.6 percent) which disotrted the so-called average figures. Including leaving out Fulcom Seaboard, which had by far the best earnings, Wilson failed to mention Bridger Coal which had a 60 percent figure and the Pacific Minerals which had 37 percent, thereby leaving two companies with unreasonable low percentage earning figures and therefore arriving at a fixed coal company average of 13.1 percent, a figure which, in my opinion, is distorted. Had he included Bridger Coal and Pacific Minerals, there would have been a considerably higher change in his "average" figure.

I find Dr. Wilson's testimony to be both arbitrary and discriminatory in an effort to get the PSC to accept his methodology and feel that no credible evidence was submitted to the record on rates of return on "comparable coal companies."

As previously noted, I find that the PSC's posture in this matter is totally inconsistent with its prior actions with regard to the Pacific Power and Light Company and the MDU where it refused the very testimony that was given by Dr. Wilson in this

matter. In Knife River, supra, we allowed a return of 13.5 percent which is nearly identical to the rate of return of 13.45 percent allowed Montana Power on its utility operations. After our decision in Knife River, supra, the case was returned by the District Court to the PSC for them to consider the testimony on a competitive market methodology and stayed with their original opinion supporting Dr. Wilson.

Last but not least, the PSC contends that Montana Power had no right at this stage of the proceedings to challenge Dr. Wilson's comparisons for the first time. They claim that the MPC had a burden of contradicting Dr. Wilson's study of comparable coal companies at the hearing, and, as it stands now, there is no evidence which can sufficiently rebut the testimony of Dr. Wilson. In pursuing the argument that Montana Power did not cross-examine Dr. Wilson at the hearing and is not estopped from attacking the credibility of his evidence, I would find that because the testimony of Dr. Wilson was so weak and was rebutted by the studies of Arthur D. Little, Inc., the evidence before the PSC lacked credibility and their decision to adopt his findings is both arbitrary and capricious.

While the PSC cites Vita-Rich Dairy, Inc. v. Department of Business Regulation (1976), 170 Mont. 341, 553 P.2d 980, for the authority that at the time at the judicial review level, the appellant, MPC was precluded from raising the issue for the first time, I do not believe that holding stands for a rule that a party cannot argue on appeal from a record that the testimony of the key witness is without substance.

I would reverse the decision of the District Court and return the matter to the PSC for further hearings.

_____
Justice

_____
_____
Justices

-16-