No. 80-99

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

_____

MOUNTAIN STATES TELEPHONE AND
TELEGRAPH COMPANY, a Colorado
corporation,

Plaintiff and Appellant,

vs.

THE DEPARTMENT OF PUBLIC SERVICE
REGULATION, MONTANA PUBLICE SERVICE
COMMISSION et al.,

Defendants and Respondents.

_____

Appeal from: District Court of the First Judicial District,
In and for the County of Lewis and Clark.
Honorable Peter Meloy, Judge presiding.

Counsel of Record:

For Appellant:

Hughes, Bennett, Kellner and Sullivan, Helena, Montana
J. Walter Hyer argued, Denver, Colorado

For Respondents:

Calvin K. Simshaw argued, M.P.S.C., Helena, Montana
James C. Paine Montana Consumer Counsel Counsel, Helena,
Montana
John Allen argued, Consumer Counsel, Helena, Montana

_____

Submitted: January 12, 1981

Decided: FEB 5- 1981

Filed: FEB 5- 1981

_____Thomas J. Kearney_____
Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

This is an appeal by Mountain States Telephone & Telegraph Company (Mountain Bell) from a judgment of the District Court in a utility rate case. The Montana Public Service Commission (PSC) granted Mountain Bell an annual rate increase totalling $3,097,000 as compared to the $11.83 million sought. The District Court concurred. We affirm.

Mountain Bell petitioned the PSC for utility rate increases that would generate $11.83 million additional yearly revenues from its Montana customers. PSC granted interim rate increases of $2,326,000 pending its final decision which are not at issue in this appeal. PSC's final order granted Mountain Bell an annual revenue increase of $3,097,000 in increased charges for its services to its Montana customers.

Mountain Bell petitioned the District Court of Lewis and Clark County for judicial review of PSC's final order pursuant to the Montana Administrative Procedures Act. Subsequently Mountain Bell elected to proceed under Montana Public Utilities Act (Section 69-3-401, MCA et seq). The District Court's pretrial order narrowed the issues to two: (1) PSC's application of the "double leverage" adjustment in determining the cost of capital in Mountain Bell's rate base, (2) PSC's "NARUC" tax adjustment.

The District Court received the transcript of proceedings before the PSC, heard additional evidence, and remanded the case to the PSC for reconsideration on the basis of the additional evidence. The PSC reconsidered, affirmed its previous final order, and returned the case to the District Court. The District Court affirmed PSC's final order holding (1) that the "double leverage" concept was lawful, was applied within the statutory authority of the PSC, and was supported by substantial evidence, and (2) that the "NARUC" tax adjustment was within the statutory authority of the PSC and was supported by substantial evidence.

Mountain Bell appealed from the judgment of the District Court, abandoning the issue of the "NARUC" tax adjustment.

The sole issue on appeal is the legality of PSC's "double leverage" adjustment in determining the cost of capital in Mountain Bell's rate base.

Before considering the arguments of Mountain Bell, an understanding of the capital structure of Mountain Bell and its parent company, AT&T is necessary. The "double leverage" adjustment, as applied here, is premised on the PSC's consideration of the parent-subsidiary financial relationship and its effect on the cost of capital in Mountain Bell's rate base.

It is a basic principle of utility regulation that a utility is entitled to receive a fair and reasonable rate of return on its investment in plant and equipment used to provide its services to the public. In determining a fair and reasonable rate of return, it is necessary to determine what it costs the utility to secure the required capital to finance its operations. This "cost of capital" approach to utility ratemaking involves determining the composite cost of the several types of the utility's capital, properly weighted on the basis of an appropriate capital structure. New England Telephone & Telegraph Co. v. Public Utility Commission (1978), ____Me.____, 390 A.2d 8, 32. The "cost of capital" involves not only the interest the utility must pay on its borrowed capital (debt), but also the cost of attracting purchasers of its common stock (equity). A regulatory commission such as the PSC must authorize utility rates sufficient to cover the utility's cost of debt and cost of equity, but no more, or the utility's customers will be paying excessive rates for the services the utility provides.

In this case Mountain Bell's capital structure as reflected in its books indicates that it is funded 44.65% by borrowed funds (debt) and 55.35% by sale of its common stock (equity). Because Mountain Bell is partially financed by debt

and partially financed by equity, Mountain Bell's common stockholders are said to be "leveraged" to the extent that the cost of its debt is less than the (weighted) cost of its capital. In other words, Mountain Bell's common stockholders are "leveraged" because Mountain Bell is paying less interest on its borrowed funds than the return it makes on the use of its borrowed funds. This is leverage #1.

But in this case there is a second or "double leverage" enjoyed by the common stockholders of AT&T arising out of the parent-subsidiary relationship between AT&T and Mountain Bell. When this case was heard by the PSC, AT&T owned 88.55% of the common stock of Mountain Bell, with the balance being held by minority stockholders. Thus the common stockholders of AT&T are "double leveraged": first, because the cost of debt in AT&T's capital structure is less than the return it makes on the use of its borrowed funds; and second because it derives the benefit of similar leverage in Mountain Bell's own capital structure by reason of its 88.55% ownership of Mountain Bell's common stock.

The PSC found that if the "cost of capital" in Mountain Bell's rate base was considered in isolation without regard to the "double leverage" enjoyed by AT&T's common stockholders, it would result in an excessive return to AT&T's common stockholders at the expense of Montana utility ratepayers. To correct this inequity, the PSC applied a "double leverage" adjustment in determining the "cost of capital" in Mountain Bell's rate base.

In summary form, the PSC applied the "double leverage" adjustment in this manner:

(1) PSC determined that the capital structure of Mountain Bell was composed of 45.65% debt (borrowed funds) and 55.35% equity (common stock) as reflected in its books.

(2) PSC determined that an 11.25% return on the capital invested in Mountain Bell was a fair and reasonable rate of return.

- 4 -

(3) PSC determined that if Mountain Bell had been funded in the open market the weighted cost of Mountain Bell's capital would have been 9.47%, figured as follows:

| Type of Capital | % of Capitalization | | Cost | | Weighted Cost |
|---|---|---|---|---|---|
| Debt | 44.65% | X | 7.26% | = | 3.24% |
| Common Stock | 55.35% | X | 11.25% | = | 6.23% |
| | 100.00% | | | | 9.47% |

(4) PSC determined that 88.55% of Mountain Bell's equity is owned by AT&T whose weighted cost of capital is 9.86% figured as follows:

| Type of Capital | % of Capitalization | | Cost | | Weighted Cost |
|---|---|---|---|---|---|
| Debt | 23.1% | X | 6.47% | = | 1.49% |
| Preferred Stock | 8.0% | X | 7.82% | = | .63% |
| Common Stock | 68.8% | X | 11.25% | = | 7.74% |
| | | | | | 9.86% |

(5) PSC determined that 88.55% of Mountain Bell's equity should be sourced to AT&T because it owned 88.55% of Mountain Bell's stock; and AT&T's cost of capital of 9.86% should be applied to such 88.55%. The remaining 11.45% of Mountain Bell's equity held by minority stockholders was allowed a capital cost of 11.25%.

(6) PSC determined that the composite weighted cost of capital to Mountain Bell was 8.78% based on the following computation:

| Type of Capital | % of Capitalization | | Cost | | Weighted Cost |
|---|---|---|---|---|---|
| Debt | 44.65 | X | 7.26% | = | 3.24% |
| Equity supplied by AT&T (88.55% x 55.35%) | 49.01 | X | 9.86% | = | 4.83% |
| Equity supplied by minority stockholders (11.45% x 55.35%) | 6.34 | x | 11.25% | = | 0.71% |
| | | | | | 8.78% |

The use of 8.78% as the weighted cost of capital of Mountain Bell will result in a return of 10.01% to its minority stockholders rather than the 11.25% found to be a fair and reasonable return by the PSC. The District Court held this inequity was the result of the capital structure of AT&T and

- 5 -

Mountain Bell rather than the PSC's rate order. The District Court pointed out that the PSC's function was fulfilled when it established a fair and reasonable rate of return on the utility's investment regardless of how the utility's management distributed that return among its stockholders.

Mountain Bell advances three principal arguments against the PSC's application of the "double leverage" adjustment in determining the cost of capital in Mountain Bell's rate base: (1) that it is not supported by substantial evidence, (2) that the "double leverage" adjustment as applied by the PSC is inconsistent within itself, ignoring the very principles on which it is based, and (3) it is premised on a disregard of applicable law in that the minority stockholders will not receive the return on their investment found to be fair and reasonable by the PSC.

At the outset we note that Mountain Bell's third argument is now moot. The minority stockholder's interests in Mountain Bell have been purchased by AT&T. Mountain Bell is now a wholly-owned subsidiary of AT&T.

Mountain Bell contends first that PSC's use of the "double leverage" adjustment must be set aside as unsupported by substantial evidence. Mountain Bell urges that the uncontradicted evidence shows that Mountain Bell's capital structure appropriately consists of 44.65% debt, but by use of the "double leverage" adjustment, the PSC raised Mountain Bell's debt ratio to 55.99%, without an analysis of the effect on the cost of equity. The addition of 11.34% debt into the capital structure must be accompanied by a change in the cost of equity, in order to provide a return to equity reflecting the increased risk. The result is a substantial understatement of Mountain Bell's revenue requirements—a result which is contrary to the financial principles relied on by the parties, according to Mountain Bell.

The evidence presented by the PSC established to the satisfaction of the district judge that the "double leverage"

adjustment was based on substantial evidence. The District Court found that the double leverage adjustment simply established the true cost of that portion of Mountain Bell's equity (common stock) attributable to AT&T's financing (88.55%). The PSC established 9.86% as the true cost by weighing the three associated costs making up AT&T's capital structure--debt, preferred stock and common stock. Contrary to what Mountain Bell asserted, this adjustment did not infuse additional debt into Mountain Bell's capital structure. The earnings of Mountain Bell will be subject to the same debt obligations regardless of the source of the equity investment. There is no increase in the financial risk nor any change in the priority of the Mountain Bell stockholders' claim to the assets or income of Mountain Bell. Therefore, the Mountain Bell stockholders are not entitled to a greater rate of return because the risk of the stockholders has not been increased. Here the return to the stockholders of Mountain Bell capital is influenced because the capital structure of the consolidated Bell System has varying amounts of debt in the capital structure of both AT&T and Mountain Bell, not because the "double leverage" adjustment has increased the risk to stockholders in Mountain Bell.

We note that the "double leverage" adjustment has previously been recognized by regulatory commissions in situations involving a parent and a wholly-owned subsidiary: Re General Telephone Company of Wisconsin (1960), 34 PUR3d 497, 515-519; Re Hawkeye State Telephone Co. (1974), 2 PUR4th 166, 180-181; Re United Telephone Co. of New Jersey (1974), 2 PUR4th 299, 307-310; Re Midstate Telephone Co., Inc. (1975), 10 PUR4th 88, 95-96; Re Continental Telephone Co. of Minnesota, Inc. (1976), 14 PUR4th 310, 315-317; Re Blackstone Valley Electric Company (1978), 24 PUR4th 309, 321-323. It has been recognized but denied application in the only appellate decision cited involving a parent corporation owning 86% of the stock of the subsidiary. New England

Telephone & Telegraph Co. v. Public Utilities Commission, supra,

____Me.____, 389 A.2d at 39-43. That case is clearly

distinguishable, in that the Maine Commission failed to ade-

quately consider the effect of "double leverage" on both the

majority and minority shareholders so as to enable the court to

determine the reasonableness of the result; additionally the

method of applying double leverage by the Maine Commission was not

supported by substantial evidence and was inconsistent with the

Commission's own declaration concerning the "double leverage"

concept. None of these factors is present in the instant case.

The District Court found that "the application of 'double

leverage' does not cause an increase in financial risk and there

is, therefore, no increase in the cost of equity" and "there

being no change in priorities [the priority of claims of Mountain

Bell stockholders to the assets and income of Mountain Bell]

there is no change in financial risk and no change in the cost of

equity." (Bracketed material inserted.)

We hold that the PSC's order was lawful and was supported

by substantial evidence. Accordingly, we affirm the District

Court on this issue mindful of our role in reviewing cases under

the Montana Public Utilities Act (sections 69-3-401, MCA et

seq.).

Our review in utility rate cases is limited to determining

whether the PSC order (1) exceeds the constitutional or statutory

powers of the PSC or (2) is based upon a mistake of law. Cascade

County Consumer's Ass'n v. PSC (1964), 144 Mont. 169, 192, 394

P.2d 856, 868. The Commission is the judge of the facts and the

court only decides questions of law. New England Telephone &

Telegraph Co. v. Public Utilities Commission, supra, ____Me.____,

390 A.2d at 15. In deciding questions of law, this Court may

determine whether the PSC acted arbitrarily and unreasonably

without sufficient evidence to support its findings, or exercised

its authority unreasonably, or set the utility rates so low that

they are confiscatory and deprive the utility of its property without due process of law. Cascade County Consumers Ass'n v. PSC, supra. This Court on appeal cannot substitute its judgment for that of the PSC. State v. Public Service Comm. (1957), 131 Mont. 272, 280-281, 309 P.2d 1035, 1040.

Mountain Bell next contends that the "double leverage" adjustment applied by the PSC is inconsistent with itself and understates Mountain Bell's revenue requirements in part by ignoring the principles on which the "double leverage" adjustment is based. Mountain Bell argues that the principle on which the "double leverage" adjustment is based is that the source of funds determines its cost; that the PSC applied its "double leverage" adjustment to retained earnings as well as to paid-in capital of Mountain Bell; that PSC misapplied the principle on which the "double leverage" adjustment is based because the source of the retained earnings is not AT&T but the assets, income, and capital structure of Mountain Bell; in so doing PSC sourced 88.55% of Mountain Bell's retained earnings to AT&T and applied AT&T's overall cost of capital to those retained earnings. This is inconsistent with the principle that the source of funds determines its cost, is unsupported by any evidence, and is totally arbitrary and illogical, according to Mountain Bell.

The PSC argued to the District Court that the true source and ultimate destination of 88.55% of Mountain Bell's retained earnings is AT&T. The cost of capital associated with 88.55% of Mountain Bell's retained earnings is 9.86% (the cost of capital to AT&T) because that is the cost of capital associated with that portion of Mountain Bell's operating assets that generated those retained earnings. If Mountain Bell retains a portion of its earnings these are no less the capital of AT&T than paid-in capital. PSC further emphasized that no court or commission has accepted Mountain Bell's argument that the source of retained earnings is the subsidiary and not the parent which controls its

stock, or that a distinction should be made between cost of capital attributable to paid-in capital and that attributable to retained earnings.

Consumer Counsel agreed that the retained earnings are a reinvestment by the stockholders of Mountain Bell in the company. Consumer Counsel pointed out that before Mountain Bell's board of directors (controlled by AT&T by reason of its majority stock ownership) ever retained part of its earnings they were available to Mountain Bell's stockholders as dividends. Thus the source of 88.55% of Mountain Bell's retained earnings is AT&T which has complete control over Mountain Bell's board of directors and thus complete control over whether its earnings are retained by Mountain Bell or paid out as dividends. Accordingly, the PSC properly included retained earnings in the equity investment of AT&T in Mountain Bell and applied AT&T's cost of capital to its entire equity investment in Mountain Bell.

The District Court adopted the reasoning of Basil L. Copeland, Jr. in his article "Double Leverage One More Time," 100 Public Utilities Fortnightly 19, in finding in favor of the PSC:

> " . . . the cost of equity is the same whether the equity was raised in the capital market or exists in the form of retained earnings. If a subsidiary retains a portion of its earnings, the earnings it retains are no less the capital of the parent than the capital recorded on its accounts as 'paid in'!"

The District Court held that because retained earnings are the property of the equity owner (AT&T to the extent of its 88.55% ownership of Mountain Bell's common stock) it had a claim against 88.55% of Mountain Bell's retained earnings. Therefore the PSC correctly applied its "double leverage" adjustment in order to reflect the true cost of capital associated with that portion of Mountain Bell's retained earnings attributable to the parent AT&T.

The record in this case shows substantial, though

conflicting, evidence supporting the PSC's application of the "double leverage" adjustment. The district judge based his findings on that evidence, and we will not overturn him.

In sum, the District Court held that PSC's concern was to determine a rate base which represents the total investment in property used and useful in rendering utility services and to multiply that by a rate of return sufficient to generate enough earnings to make the return on investment fair and reasonable. The District Court further held that PSC function is fulfilled when it determines such total investment and a rate of return which will afford a reasonable return on that investment.

This is a correct statement and the evidence shows that the PSC acted reasonably and within the bounds of the law. It would appear that the PSC applied the "double leverage" adjustment in order to protect Montana ratepayers from paying excessive utility rates. A fair overall rate of return to all stockholders on their investment was fixed and determined, but because the capital structure of AT&T afforded double leverage to the common stockholders of AT&T their rate of return on their investment in Mountain Bell would always be greater than the minority stockholders in Mountain Bell regardless of what rate of return might be adopted by the PSC. This discrepancy is inherent in the capital structure of the parent AT&T vis-a-vis the capital structure of the subsidiary Mountain Bell. This capital structure was determined by the management of the two companies, not by the rate order of the PSC. The PSC's function was fulfilled when it established a fair and reasonable return on Mountain Bell's investment in plant and equipment used and useful in furnishing its services to the public. It is a function of management to distribute that return to its stockholders and if Mountain Bell's capital structure prevents an equitable distribution, this is not the fault of the PSC. To guarantee the minority stockholders the 11.25% return found to be fair and

reasonable by the PSC would result in an unconscionable and excessive return of 14.26% to AT&T common stockholders at the expense of Montana ratepayers, all because of the capital structure of the two companies. This inequity will not recur in the future as Mountain Bell is now a wholly-owned subsidiary of AT&T with no minority stockholders in Mountain Bell.

Affirmed.

_Frank I. Haswell_
Chief Justice

We concur:

_____

_____

_____

_____

Justices

_Mark P. Sullivan_
Hon. Mark Sullivan, sitting in
place of Mr. Justice Shea who deems
himself disqualified.