No. 80-346

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

---

MONTANA-DAKOTA UTILITIES CO.,

Plaintiff and Appellant,

vs.

GORDON E. BOLLINGER, CLYDE JARVIS,
et al.,

Defendants and Respondents.

---

Appeal from: District Court of the Seventh Judicial District,
In and for the County of Dawson.
Hon. Nat Allen, Judge presiding.

Counsel of Record:

For Appellant:

Crowley, Haughey, Hanson, Toole & Dietrich,
Billings, Montana
George Dalthorp argued, Billings, Montana
Joseph R. Maichel argued, Bismark, North Dakota

For Respondents:

Eileen E. Shore argued, Helena, Montana
James Paine argued, Helena, Montana
John Allen, Helena, Montana

---

Submitted: June 8, 1981

Decided: AUG 5 - 1981

Filed: AUG 5 - 1981

*Thomas J. Kearney*
Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

Montana-Dakota Utilities Company (MDU) appeals from a judgment entered in the Dawson County District Court, the Honorable Nat Allen presiding, affirming an order of the Public Service Commission (PSC) which set allowable electric and natural gas rates.

In March 1978 MDU filed an application with the PSC requesting, among other items, an increase of its electric utility rates. In its request MDU asked the PSC to accept, as part of the rate base, money expended by the company in obtaining coal from Knife River Coal Company (Knife River). Knife River is MDU's wholly-owned subsidiary and supplies 100 percent of the coal needed for MDU's coal-fired generators under long-term contracts. Approximately 34 percent of Knife River's total sales are made to MDU with the remaining 66 percent of sales being made to other utilities and manufacturing concerns.

During a hearing on the rate increase request, the PSC heard testimony on two different methods for monitoring the reasonableness of the price MDU pays for its coal. MDU suggested the use of a "market price" method: an examination of the price charged in the marketplace for similar sales in comparison to those prices being charged by the subsidiary to the parent; if a favorable comparison is found, the price is deemed reasonable and no adjustment is necessary. A "rate of return" method was offered by the Montana Consumer Counsel which called for an examination of the return being earned by the subsidiary on its sales to the parent; an excessive rate of return requires an adjustment.

In asserting the application of its method, the Con-

sumer Counsel's expert witness, Dr. John W. Wilson, testified that the return on the total net investment for Knife River for 1977 was approximately 33 percent. (This rate of return was based on Knife River's capitalization of $15,899,519.) Dr. Wilson was of the opinion that the percentage was in excess of a reasonable rate of return and recommended that MDU's coal expense be reduced by 2.6 million dollars. This adjustment would represent the reduction of all Knife River profits to a level equal to the profit (rate of return) MDU is allowed to earn on its equity investment (12.124 percent). MDU resisted the Consumer Counsel's recommendation, claiming that its coal purchases from Knife River were reasonable and fair having been made in a competitive environment.

In issuing its order the PSC deemed the claimed coal expense excessive and chose to make use of the rate of return method in monitoring its reasonableness. In applying this method, the PSC used the following formula:

A. Knife River's capitalization is determined by the Consumer Counsel's witness, Wilson, in the amount of $15,899,519.

B. MDU's rate of return on equity is applied to the capitalization to produce a revenue amount: 12.124 percent x $15,899,519 = $1,927.658.

C. This amount is subtracted from the return actually earned by Knife River: $4,475,885 - $1,927,658 = $2,548,227.

D. MDU's direct and indirect purchases of coal from Knife River are determined by Consumer Counsel's witnesses to be 33.91 percent of Knife River's total sales.

E.  Direct and indirect sales from Knife River to MDU are then determined: $2,548,227 x 32.8272% = $836,512.

F.  Montana's portion of the claimed excessive coal costs is then determined by multiplying by the proportion of Montana's kwh sales to total interconnected system kwh sales: $836,512 x 33.91% - $283,661. (Consumer Counsel's position that the reduction be based on all Knife River profits was not adopted.)

An appeal of the PSC order was taken to the District Court by MDU. After review, the court held that there was substantial evidence in the record to sustain the PSC's decision to use the rate of return method as well as the application of that method.

MDU now appeals to this Court claiming: (1) that the PSC is operating under a mistake of law in concluding that under the circumstances it could apply a rate of return on net fixed assets method as a means of determining whether the price paid for Knife River coal was reasonable; (2) that the PSC has regulated Knife River which is beyond their statutory power; and (3) that the order is an unconstitutional deprivation of property without due process of law.

The issue presented to this Court for review is framed as follows:

Did the PSC abuse its authority in its utilization and then its particular application of the rate of return method in ascertaining the reasonableness of MDU's coal expense from a wholly-owned subsidiary corporation?

Appellant, Montana-Dakota Utilities, generally contends that the central issue is whether the price of coal sold to MDU by Knife River is excessive; if it is not, the

full cost should be allowed as a ratepayer expense. In making this determination an examination should have been made of the going price for coal in the applicable competitive marketplace. Here, there is substantial evidence that a competitive marketplace exists and that the price paid was equal to or less than the going price. As a consequence, the costs claimed by MDU should not have been deemed excessive, and the rate of return method should not have been applied.

Appellant further contends that even if there is not a competitive marketplace by which to evaluate the reasonableness of the price charged MDU, it does not follow that the price was excessive. If the profits received by Knife River on the sale of coal to MDU are considered in relation to the fair market value of the assets of the company ($118,000,000), its rate of return is merely 1.6 percent. Certainly such a margin of profitability is not excessive and, thus, is reasonable even in absence of a competitive marketplace.

Appellant argues further that use of the rate of return method is unfair and inappropriate in this instance. Knife River is engaged in a nonregulated competitive industry. The method, as applied, is thus tantamount to the confiscation of Knife River's assets. It has the effect of utilizing a depletable asset of Knife River to artificially depress electric utility rates below the proper and reasonable level mandated by our current inflationary economy. The only proper means of determining the reasonableness of the price paid by MDU in this instance is in applying a "fair market" method.

Respondent claims that both methods presented to the PSC have been recognized as acceptable monitoring devices to test the reasonableness of coal sales. A fundamental prerequisite of the competitive price method, however, is that an independent competitive market be present in which comparable prices can be drawn. Here, there is no competitive environment as indicated by the following factors: (1) 100 percent of MDU's coal requirement is supplied by Knife River under long-term contract; (2) boiler designs require coal of a certain grade or type, and MDU failed to show whether any other "competitor" could supply the needed quality; (3) MDU's generating plants are located in proximity to Knife River's mines giving it an insurmountable competitive advantage when transportation costs are figured into coal costs.

Respondent further argues that application of the rate of return method does not constitute an impermissible regulation of Knife River. The only effect of the PSC order is to limit the coal expenses MDU can pass along to its Montana customers in its rate base. It does not in any way limit the price MDU pays Knife River, nor does it limit Knife River's profits from sales to MDU or any other customer.

Respondent then concludes that use of Knife River's capitalization as a base against which profits are measured was not improper. The interest of the PSC is to see that MDU does not reap an unfair profit on its investment in its subsidiary by allowing the subsidiary to overcharge the parent for coal when the coal expense will be passed on to the ratepayers. The capitalization figure represents MDU's

investment in Knife River. In ascertaining the rate on that investment, the capitalization figure must be used.

A function of the PSC, in fulfilling its duty to supervise and regulate the operations of MDU as an electric utility, is to see that MDU's rates are just and nondiscriminatory. Section 69-3-330, MCA. In complying with this obligation, it follows that the PSC must scrutinize and review the operating expenses of MDU to prevent unreasonable operating costs from being passed on to the customer. When one of the expenses submitted by MDU is caused by transactions with a subsidiary company, the scrutiny applied by the PSC must be all the more intense. See Priest, Principles of Public Utility Regulation, Vol. 1, p. 80; General Telephone Co. of Upstate New York v. Lundy (1966), 17 N.Y.2d 373, 218 N.E.2d 274.

MDU, in an attempt to establish the reasonableness of the coal expense resulting from the purchase of coal from its subsidiary, submits that the price should be monitored in the context of a natural resource company operating in the free marketplace, and not in the context of a regulated public utility. In this regard, MDU submitted evidence which showed: (1) that the price charged MDU by Knife River is lower than the price available from any alternative source; (2) that Knife River charges MDU the same price it charges its other customers; and (3) that Knife River's profits are reasonable when measured against the fair market value of its assets (fair market value of $118,000 with a rate of return at 1.6 percent).

Use of the fair marketplace as a monitoring device as submitted by MDU is obviously dependent upon a competitive

environment. Without such an environment, no adequate frame of reference exists in which the fairness of Knife River's price can be determined. In this instance, the PSC heard testimony that Knife River prices to MDU are the same as those charged to other customers, not necessarily because of the inherent fairness of the price, but because Knife River is merely complying with the Robinson Patman Act which requires sales of coal of like kind and quantity to be offered at the same price to all customers.

Evidence was also presented that the proximity of MDU's generating plants to Knife River gives Knife River a competitive advantage that is insurmountable by current competitors when one considers that transportation costs often exceed coal costs. This, taken with the fact that Knife River supplies 100 percent of MDU's coal requirements under long-term contracts, leads to the PSC's conclusion that anti-competitive factors were present and that evidence of a competitive environment needed to apply a market price method was inconclusive. As a consequence, the PSC refused to examine market price or market value as the sole factors to be considered in determining the reasonableness of MDU's coal expense.

The market price method not being available for use in this instance, the PSC chose to utilize a rate of return method. This method of monitoring the reasonableness of coal prices paid by a parent to its subsidiary is not new to the field of utility law. See Competition in the Coal Industry, Report of the United States Department of Justice, Pursuant to Section 8 of the Federal Coal Leasing Act of 1975; Application of Montana-Dakota Utility Co. for

Authority to Establish Increased Rates for Electric Service
(S.D. 1979), 278 N.W.2d 189; Mississippi River Fuel Corp. v.
Federal Power Commission (D.C. Cir. 1957), 252 F.2d 619.

In applying this method the PSC chose to use a cost
approach to analyze Knife River's profits and computed a 33
percent rate of return during the 1977 test year (relation
of profits to original investment less depreciation). The
PSC then concluded that this rate of return was too high and
restricted MDU's coal expense stating that a reasonable rate
of return for Knife River's sales to MDU should be equal to
the rate of return allowed MDU on its overall operation
(12.124 percent). We note, however, that the PSC, in making
this conclusion, failed to indicate on what basis it deemed
a 33 percent rate of return unreasonable or why a 12.124
percent rate is reasonable under the circumstances.

The Consumer Counsel's expert witness testified that
other coal companies earned returns that were significantly
lower than Knife River's. The only actual comparison made,
however, indicated that an independent coal company had a
31.89 percent rate of return in 1977, as compared to Knife
River's 33.43 percent. On a five-year average (1973 to
1977), the rate of return for the independent was 17.8
percent and for Knife River 20.69 percent. The percentage of
Knife River is certainly higher, but this Court questions
whether such a small sampling is supportive of a finding
that 33.43 percent is excessive or that 12.143 of equity is
a reasonable rate of return.

In imposing a limit of 12.143 percent rate of return
on Knife River's coal sales to MDU, the PSC apparently was
acting on the rationale that a ratepayer should not be

forced to contribute to the profit of the utility company twice. Here, the ratepayer pays a fair rate of return to the utility on its cost of capital (12.124 percent). The consumer is then asked by MDU to pay for its coal expense which contains a 33 percent profit level to be earned by MDU as the parent company (investor) of Knife River. The end result is that MDU is allowed a profit from its utility operations, as allowed by the regulatory body, then also earns an "excess" profit on its investment from the subsidiary, all at the expense of the ratepayer.

MDU's earnings on its investment in Knife River is not per se improper. It is only the earning of excessive, and thereby unreasonable, profits at the expense of the ratepayer which the PSC seeks to prevent. With this principle in mind, the PSC was willing to allow MDU to earn a return on both its utility operations and its subsidiary's operation, so long as the ratepayer's contribution to the earnings of the subsidiary were limited to a reasonable level of 12.124 percent.

Upon reviewing the matter, this Court agrees in principal with this approach, but we question whether the imposed limit of 12.124 percent is "reasonable," as supported by the evidence, and not merely arbitrarily set.

The interest of the PSC is to see that MDU does not reap an unfair profit on its investment in its subsidiary by allowing the subsidiary to overcharge the parent for coal when the coal is paid for in total by ratepayers. As a consequence, the rate of return on sales by Knife River, as a wholly-owned coal company, to its parent is subject to close scrutiny. It does not automatically follow, however,

that the coal company should be held to the same rate as its parent public utility. Nor does it follow that the parent is only allowed to receive the same rate of return on the investment in its coal subsidiary as it receives on its utility property, with respect to sales between the subsidiary and the parent. If any limitation on coal profits or ratepayer coal expense is in order, it should be based on a reasonable rate of return as established by a comparable marketplace, not upon a predetermined rate as established for a regulated utility.

Perhaps the PSC, in setting the rate of return level, was relying upon the theory prevalent in the "California approach" to the issue at hand. Under this approach, the subsidiary is treated not as an independent entity but as part of the utility for rate-making purposes. The theory underlying this position was discussed in Washington Water Power v. Idaho Public Util. (1980), 101 Idaho 567, 617 P.2d 1242, 1248:

> ". . . where a utility enjoys an integrated position and market dominance, it 'should not be permitted to break up the utility enterprise by the use of affiliated corporations and thereby obtain an increased rate of return for its activites.' [Citation omitted.] Thus under this approach the question of whether the prices are reasonable is immaterial; all integrated parts of the utility are allowed the same rate of return . . ."

We note, however, that the majority of those cases using this approach involve the Bell Telephone System and its manufacturing subsidiaries. These subsidiaries sell virtually all their manufactured products to the parent, Bell Telephone--a fact which is materially different from the present situation where the bulk of Knife River coal (a depletable natural resource) is sold to customers other than

-11-

its parent. See City of Los Angeles v. Public Utilities Comm. (1972), 102 Cal.Rptr. 313, 497 P.2d 785; Re New England Telephone & Telegraph Co. (Me. 1976), 13 P.U.R.4th 65; Illinois Bell Telephone Co. v. Illinois Commerce Commission (1973), 55 Ill.2d 461, 303 N.E.2d 364; Note, Treatment of Affiliated Transactions in Utility Rate Making: Western Electric Company and the Bell System, 56 Boston U. Law Rev. 558, 568-571 (1976). Such an approach should not be deemed applicable in this instance.

In determining reasonableness, the PSC should not be restricted to any single formula "so long as the method followed and the order entered when applied to the facts and viewed as a whole do not produce an unjust or arbitrary result." Northwestern Public Service Commission v. Cities of Chamberlain, et al. (S.D. 1978), 265 N.W.2d 867, 872. Here, the PSC chose to apply a rate of return method in an effort to determine the reasonableness of the price paid by MDU for Knife River coal. Our inquiry is to determine if this method produces an unjust or arbitrary result.

In considering the method this Court cannot substitute its judgment for that of the PSC, but the Court may determine whether the PSC acted arbitrarily and unreasonably without sufficient evidence to support its findings. Mountain States Telephone & Telegraph Co. v. Dept. of Public Service Regulation (1981), ___ Mont. ___, 624 P.2d 481, 38 St.Rep. 165, 170. After analyzing Knife River's profits in comparison to capital investment, the PSC summarily labeled Knife River's rate of return on sales to MDU as unreasonable, when in fact no substantial evidence was presented to support such a conclusion. The PSC must have sufficient

evidence before it to determine if a particular rate of return is fair and just for Knife River as compared to other coal companies. Unless there is substantial evidence to show that the rate of return of MDU is also applicable to the coal company, there is no basis for an application of the MDU rate of returrn to Knife River as was done by the PSC.

It is apparent that the natural resource company, Knife River, doing a majority of its business with parties other than MDU, may be entitled to a significantly different rate of return than would be true if it were a utility or if it were selling all of its coal production to MDU. It may be that the PSC does not have the expertise to readily determine the rate of return on a natural resource coal company as compared to a utility. The evidence shows that a large part of Knife River's coal reserves were acquired a number of years ago at a low cost. As an example, leases acquired at a cost to Knife River of less than $400,000 cover 585,000,000 tons of coal which has a market value of $93,000,000. In a similar manner, the evidence shows that the Beulah mine owned by Knife River will be fully depreciated in 1981, so that if undepreciated cost to Knife River is used for a rate of return, no profit at all would be allowed on the Beulah mine. If the PSC ultimately concludes that it still desires to use the rate of return method, it must take into consideration such facts as these so that its action will not be arbitrary.

In view of the necessity for a rehearing, the PSC should again consider if there is an independent, competitive market which establishes a going market price for coal,

from which the PSC can determine if the price MDU pays Knife River for coal is reasonable. While it is true that the PSC found that absolute comparability between coal prices impossible to determine, it appears to this Court that the prices paid by a number of other companies to Knife River for two-thirds of its coal production is evidence of a competitive market for comparison to the Knife River price paid by MDU. In addition, there was evidence of prices charged by other companies in the competitive area. If the PSC finds that the present evidence is insufficient, it appears appropriate that the PSC require the parties to submit additional evidence from which the PSC can determine if MDU is paying Knife River a price which is no higher than the competitive marketplace requires.

As a matter of justice, it appears to this Court that it might be better for the PSC to use a marketplace cost of coal approach, if it can obtain sufficient facts for its determination, rather than using the rate of return method with all of its difficult theories and computations. While the PSC does have the right to chose the method followed, this Court did not find a factual reason for the summary rejection of the marketplace cost of coal approach.

We, therefore, vacate the judgment of the District Court and remand the case to the PSC with instructions to hold an additional hearing to determine the following: (1) if rate of return is used, a factual basis for the rate of return allowed Knife River considering its assets and rate of return on a marketplace basis comparable to other coal companies; or (2) in the event market cost of coal is used, sufficient facts to support the PSC determination of the

-14-

fair market price for coal.

_____
        ' Justice

We concur:

_____
      Chief Justice

_____


_____

_____
      Justices

_____
Honorable Leonard H. Langen,
District Judge, sitting in place
of Mr. Justice Daniel J. Shea

-15-

Mr. Justice John C. Sheehy, dissenting:

I have tried in vain to reason with my colleagues not to take what I view as a backward step in the developing law of utility regulation in Montana.

The result is a majority opinion that is unwarranted, useless and contradictory. Unwarranted, because it is an intrusion on the right of the Public Service Commission to determine the methodology it uses for a reasonable rate of return on equity. Useless, because it sets the PSC to an impossible task, determining a market where no market exists. Contradictory, because it conflicts with itself, and because it contradicts Mountain States Telephone and Telegraph Company v. The Department of Public Service Regulation, et al., Decided February 5, 1981, 38 St.Rep. 165.

Let us take the contradictions first. By statute the PSC "is not bound to accept or use any particular value in determining rates; provided, that if any value is used, such value may not exceed the original cost of the property . . ." Section 69-3-109, MCA. Moreover, the Commission is invested "with full power of supervision, regulation, and control" of public utilities. Section 69-3-102, MCA. The PSC decided under its broad power to follow the "California" approach and treat MDU's subsidiary as a part of the utility for ratemaking purposes. The majority opinion pays pious lip service to the right of PSC to determine its own methodology in valuing the coal purchased from Knife River, but then contradicts itself. It is contradictory to require the PSC to determine: "1. If rate of return is used, a factual basis for the rate of return allowed Knife River considering its assets and rate of return on a market place basis comparable to other coal companies; or, 2. In the event market cost of coal

-16-

is used sufficient facts to support the PSC determination of the fair market price for coal." Those requirements are completely out of sync with the unitary method:

> ". . . Thus under this [California] approach the question of whether the prices are reasonable is immaterial; all integrated parts of the utility are allowed the same rate of return . . ." Washington Water Power v. Idaho Public Util. (1980), 101 Idaho 567, 617 P.2d 1242, 1248. (Emphasis added.)

The majority opinion also contradicts a position we took with respect to American Telephone and Telegraph Company and Mountain Bell. In Mountain States Telephone and Telegraph Company v. Department of Public Service Regulation, Decided February 5, 1981, 38 St.Rep. 165, we refused to allow Mountain Bell to employ a "double leverage" in its rate base, arising out of funds in Mountain Bell's capital structure borrowed from its parent AT & T.

This case is the inverse of the Mountain Bell situation. In Mountain Bell, supra, the utility was claiming that it should receive a rate of return 11.25 percent on its borrowed funds when AT & T was charging Mountain Bell 9.86 percent for the loans. We objected, saying "Mountain Bell's common stockholders are 'leveraged' because Mountain Bell is paying less interest on its borrowed funds than the return it makes on the use of its borrowed funds." 38 St.Rep. at 167. Here, the investment in Knife River from the retained earnings of the MDU shareholders (or borrowed funds, whichever) is "leveraged" because the shareholders will make more money from their Knife River investment than the reasonable rate of return on equity found by PSC. That will be the net effect of the majority decision in this case.

The majority opinion is further contradictory in that it distinguishes AT & T and its subsidiary companies, saying the application of the unitary method as to AT & T is proper

-17-

merely because AT & T is large enough to purchase nearly all of the manufactured products of its subsidiaries. What economic or regulatory reason logically exists to treat AT & T differently from energy utilities? The fact that a wholly-owned subsidiary may sell to others than its parent is not a sufficient reason to require the rate-payers of the parent to pay excessive costs. The implications of the majority opinion here will surely haunt us when future rate cases involve utilities which purchase fuel or power from the giant consortiums or joint enterprises of which the utilities are now becoming a part.

I also said that the majority opinion is unwarranted. I make that contention because the field of public utility regulation belongs exclusively to the PSC under our statutes and the methodology employed by it to determine a reasonable rate of return is exclusively its province. This would be a proper case for us to state as a rule that the PSC is not restricted to any single formula in determining the rate of return as long as the method followed does not result in an unjust and arbitrary result. Application of Mont.-Dak. Util. Co., Etc. for Authority to Establish Increased Rates for Electric Service (S.D. 1979), 278 N.W.2d 189, 191. For a business with a guaranteed market, a guaranteed monopoly, and a guaranteed profit, a 12.124 percent rate of return on equity is not to be snubbed as arbitrary or un-reasonable, even in these days.

I have also said that the majority opinion is useless, because it requires the PSC to make determinations that it has already made, and that are materially inconsistent with the unitary rate of return. The PSC carefully noted that it was not in any event attempting to regulate Knife River or to

-18-

regulate its profitability or to regulate its rate of return. MDU very carefully did not appeal from those findings of the commission.

The commission found that Knife River's profitability of 33.43 percent on net fixed assets, when compared to PSC's allowance of 12.124 percent rate of return on equity, was an "extreme" difference. It found that the only method of protecting the rate-payers from the excessive prices paid for coal was to limit the amount (but only for the rate base) that MDU would pay to Knife River for coal. After making its computations, which amounted only to the elimination of $283,661 of MDU's income, PSC made the following findings:

> "MDU has suggested that the transfer price of coal between MDU and Knife River be examined, and if it appears to be competitive, no adjustments be made. The Commission sees several disadvantages with this approach. First, the rate payer would be required to pay the going rate for coal regardless of the rate of return being earned by MDU shareholders as discussed above. Second, and most importantly, absolute comparability between coal prices is virtually impossible to determine due to a multitude of variables in mining operations, chemical composition of coal, transportation and other factors (for example, the composition of some coal may dictate the need for a more expensive boiler than other coals; which would be a cost for the utility but may not be reflected in the price per ton for coal)(A. S. Kane Rebuttal, page 28, line 14-31). Finally the bargaining between MDU and Knife River is not at arms length. Anytime an [sic] unitary entity bargains with itself, the results tend to be different than the results between bargaining between unrelated entities. (J. W. Wilson, Rebuttal, page 20, lines 5-25).

> "MDU suggested that if the Commission intends to regulate Knife River's rate of return that the fair market value of its reserves be used in determining that rate of return. Firstly, the Commission is not regulating Knife River's rate of return. Rate of return has merely been used as a method of determining excessive coal prices. Secondly, and as has been stated above, the Commission does not feel that MDU's rate payers should be subjected to coal prices that would not exist if MDU and Knife River were a single corporation. Therefore, in computing the amount MDU will pay Knife River for coal, the

Commission has used the amount of Knife River's capitalization which closely matched the original cost depreciated valuation of its assets; the same method used in valuing utility property subject to regulation. This method of reporting is consistent with the financial reporting of all corporations, including natural resource companies." PSC Order No. 4467, Par. 41I, at 25-27.

The majority opinion is further useless, because if it is followed, we will have to set aside the results in the next appeal. For example, the majority opinion requires PSC to determine "if a particular rate of return is fair and just for Knife River as compared to other coal companies." The PSC is told to consider coal leases acquired at a cost to Knife River of less than $400,000 which contain coal reserves of 585 million tons with a market value of $93 million. It is told to disregard the original cost of the Beulah Mine, now depreciated. These are things that the PSC cannot do. It has no business or authority to determine a fair rate of return for Knife River Coal Co. The commission in its opinion carefully avoided in any manner regulating Knife River Coal Co. The $93 million figure for coal reserves is the fair market value of those reserves. By statute, the commission cannot consider such a figure, for it may not use any value in excess of the original cost of the property. Section 69-3-109, MCA. It would be nice for MDU if it could recover a profit on unmined coal reserves that are still in the ground, but that has no place in the rate-making process. The District Court properly took note of the fact that the United States Supreme Court rejected the contention that the assets of a natural resource company should be valued at market value because it is gradually depleting its assets in the course of its business operations. In Federal Power Com'n. v. Hope Natural Gas Co. (1944), 320 U.S. 591, 606, 64 S.Ct. 281, 290, 88 L.Ed.2d 333, 347, the Supreme Court said:

-20-

"By such a procedure the utilities are made whole and the integrity of its investment maintained. No more is required."

Finally, the opinion is useless because it ought to be apparent to all, that a 33 percent return of profit in a single year is a good indication that no competition in the coal market exists.

The majority opinion, therefore, is amphigory. It is a rigamarole of apparent meaning, but is basically meaningless.

In this proceeding, the commission granted an increase in operating revenues for the gas utility of MDU in the sum of $5,392,283 and a decrease in its electrical utility of $88,447. The deduction which the PSC made for excessive coal charges was $286,000 which represents approximately 5.3 percent of the increase. It is not the money but the principle over which the parties here are waging war. The utility has secured the rejection by this Court of the unitary or California approach to subsidiaries as arbitrary and unreasonable. This will prove to be a sorry day for rate-payers.

I would uphold the findings of the PSC and affirm the decision of the District Court.

John C. Sheehy
Justice