No. 89-028

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

MONTANA-DAKOTA UTILITIES CO.,
A Division of MDU Resources Group,
Inc., a Delaware corporation,

Plaintiff and Appellant,

-v-

MONTANA DEPARTMENT OF PUBLIC SERVICE
REGULATION, MONTANA PUBLIC SERVICE
COMMISSION, AND MONTANA CONSUMER COUNSEL,

Defendants and Respondents.



APPEAL FROM:   District Court of the Fifteenth Judicial District,
               In and for the County of Roosevelt,
               The Honorable M. James Sorte, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

            John Alke; Hughes, Kellner, Sullivan & Alke, Helena,
            Montana
            Lester H. Loble, II; Montana-Dakota Utilities,
            Bismarck, North Dakota

        For Respondent:

            Mary Wright; Montana Consumer Counsel, Helena,
            Montana
            Denise Peterson; Public Service Commission, Helena,
            Montana


                              Submitted: April 10, 1990

                              Decided: July 13, 1990

Filed:

_____
                Clerk

Justice R. C. McDonough delivered the Opinion of the Court.

Montana Dakota Utilities Co. (MDU) appeals an order of the Fifteenth Judicial District, Roosevelt County, which affirmed an administrative rate order of the Public Service Commission (PSC). In that order, the PSC denied full recovery of costs incurred by MDU, through a purchase of firm power from the Antelope Valley Station II (AVS II) power plant. We affirm.

The sole issue on appeal is:

Was the District Court correct in affirming the PSC's decision to reprice, for ratemaking purposes, the amount of the expense that MDU could recover from its Montana ratepayers for power purchased from AVS II?

MDU is a regulated public utility providing natural gas and electric service in Montana, South Dakota and Wyoming. To meet its customers' demand for electric service, MDU owns, either individually or in partnership with other utilities, a number of generating stations located in or near its service territory. It is also a member of the Mid-Continent Area Power Pool (MAPP) from which it can acquire power under certain limited circumstances. MDU's membership in MAPP is contractual, and it is conditioned upon MDU having its own generating capacity equal to customer demand plus a reserve of fifteen percent.

MDU is experiencing a steadily increasing demand for electricity. To meet that demand, MDU has been acquiring modest amounts of generating capacity as it becomes available. In 1986, pursuant to a contract made in 1981, it purchased forty-one

2

megawatts of firm power from AVS II, a power plant which is owned by Basin Electric. Firm power is power which the seller is obligated to provide for a fixed number of years. Correspondingly, the buyer is obligated to make the purchase. The contract between MDU and Basin Electric provided the firm power purchases would be made over a ten year period. In addition to the AVS II purchase, MDU acquired additional power through purchases of additional generating resources.

In order to recover costs associated with these acquisitions, MDU filed an application with the PSC seeking authority to increase its electric rates. In the application, the company prepared a cost of service which was based upon an historic test year, in this case 1985. The application also reflected the actual costs MDU incurred in purchasing forty-one megawatts of firm power from AVS II.

Following MDU's filing, the Montana Consumer Counsel (MCC) intervened on behalf of Montana Ratepaying Consumers. At a public hearing, the MCC presented testimony from its expert, Albert Clark. Mr. Clark testified as to the effect of the AVS II purchase. In his testimony, he stated that MDU, through its purchase from AVS II, effectively replaced cheap power which could be generated at its existing plants with very expensive AVS II power. He noted, in this regard, that the average cost of energy produce at MDU's existing plants ranged between $13.52 to $24.74 per megawatt hour (mwh). The cost of AVS II power, meanwhile, equaled $48.84 per mwh.

Mr. Clark further testified, that most of the energy produced by AVS II could have been generated internally at MDU's existing plants. Relying upon this testimony, the PSC found that although AVS II was not purchased for the purpose of replacing existing facilities, that is in fact what happened because 77% of the newly acquired energy could have been generated at existing facilities.

He said the net effect of this acquisition was to replace 88,750 mwh of existing energy production with more expensive AVS II power. The purchase also allowed MDU to increase off system sales to other utilities by 45,172 mwh. And finally, the AVS II acquisition replaced 64,638 mwh of Schedule E energy, which is purchased from MAPP.

Schedule E is cheap energy which is generally purchased in order to replace more expensive energy produced by an individual power company. It is not a reliable source of power, however, because the seller can cancel the sale with a one day notice. In order to be eligible to purchase Schedule E, an individual power company must be capable of meeting its baseload requirements and have a fifteen percent surplus to meet peak demand.

Clark stated that the AVS II acquisition actually replaced existing power sources with very expensive energy. He therefore maintained that it was unfair to saddle the consumer with the full cost of AVS II. He, therefore, sought to "remix" the company's power supply figures in order to come up with a rate that was fairer to the consumer.

Mr. Clark accomplished this task by repricing the AVS II power

4

according to an alternative energy scenario. In his proposal, the electric rates were figured as if:

(1) Base load energy generation at MDU's existing facilities were increased to pre-AVS II levels. This course of action, he maintained, prevented the replacement of inexpensive power with very expensive AVS II power;

(2) The increased off-system sales were not imputed to the consumers;

(3) MAPP Schedule H energy was purchased in order to replace some of the energy produced by AVS II. Schedule H energy is relatively inexpensive energy which could be used by MDU well into the future, because there is a substantial surplus; and

(4) Remaining energy needs were satisfied through purchases of Schedule E energy from MAPP.

Initially, the PSC rejected Clark's proposal and granted a rate increase, but at a level lower than MDU requested. The PSC based its action partly upon Clark's suggested use of Schedule E energy. As stated above, Schedule E is not a dependable energy source because it can be cancelled on one day's notice. Therefore, in order to avail itself of the power, a utility company must have energy to forgo. The PSC, upon reviewing Clark's proposal, determined that he was treating Schedule E as a long-term source of energy. Due to its limitations, Schedule E cannot be used as a dependable source of power, and therefore it concluded that Clark's proposal was not feasible.

Following this decision, both the MCC and MDU submitted motions for reconsideration. In its motion, the MCC argued that the PSC misinterpreted Clark's testimony. It maintained that MDU's own power supply figures indicated that MDU could utilize 139,288

5

mwh of Schedule E energy. The MCC maintained that these figures indicated that MDU had energy to forgo prior to the AVS II purchase and therefore was able to avail itself of the cheaper energy. Obviously, if MDU had excess energy before the AVS II acquisition, it had to have extra energy following its purchase. The MCC therefore maintained that it was not treating Schedule E as a long-term energy source, but was instead, treating it exactly as it is supposed to be, namely a source of low cost energy which is purchased to displace higher cost energy.

Upon reconsideration, the PSC agreed that it misinterpreted the information contained in Mr. Clark's testimony. It concurred that his proposal treated Schedule E energy correctly and that this treatment made the AVS II adjustment acceptable. It therefore granted the MCC's motion and further reduced the level of the rate increase.

MDU then appealed the matter to District Court. The District Court affirmed the PSC's order and specifically found that it acted properly in "repricing" AVS II energy because MDU's own numbers established that it did not need to incur the expense to meet present or future demand. It further found that a portion of the expense incurred through the AVS II acquisition was unreasonable and therefore should not be passed on to the consumer. This appeal followed.

In utility rate cases this Court has traditionally held itself bound by a very strict standard of review. In previous cases we have stated:

. . . [T]his Court is always confronted in ratemaking cases with the question of how far the court can go in interfering with, or directing the exercise of power, by an equal department of government. We have repeatedly held that there will be no interference with the orders of the Commission unless:

(1) they go beyond the power constitutionally given; or

(2) beyond their statutory power; or

(3) they are based on a mistake of law.

Cascade County Consumers Ass'n v. Public Service Comm'n (1964), 144 Mont. 169, 192, 394 P.2d 856, 868; Mountain States Telephone and Telegraph v. Department of Public Service Regulation (1981), 191 Mont. 331, 339, 624 P.2d 481, 485.

This strict standard of review is necessitated by the nature of controversies surrounding utility rate cases. These cases are generally very complicated and involve the review and interpretation of testimony given by experts in fields such as engineering and economics. The PSC, because of its expertise and familiarity with these types of cases, is best suited to review the evidence presented by such testimony and make the decisions. In light of this fact, this Court has traditionally refused invitations to substitute its judgment for that of the PSC.

In rate cases, the PSC is the judge of fact and this Court only determines questions of law. In deciding questions of law, our review only requires us to determine "whether the PSC acted arbitrarily and unreasonably without sufficient evidence to support its findings or exercised its authority unreasonably or set the rates so low that they are confiscatory and deprive the utility of its property without due process of law." Montana-Dakota Utilities

v. Department of Public Service Regulation (1988), 231 Mont. 118, 752 P.2d 155. This standard of review, which has been described in case law, has its origins in the Montana Administrative Procedure Act. Under this act, findings of fact are subject to a "clearly erroneous" standard of review, while conclusions of law are subject to an "abuse of discretion" standard of review. Section 2-4-101, MCA, et seq.

MDU maintains that the PSC acted unlawfully by limiting its determination of the need for AVS II power to the 1985 test year and by "repricing" the AVS II power without any determination that the company acted imprudently or unreasonably. As for the first assignment of error, MDU maintains that the AVS II purchase should be considered a long-term investment which should be included in the rate base. Usually, items which are considered to be rate base expenditures include new power plants, transmission lines, etc. If the utility can prove that such facilities are "used and useful" they are entitled to earn a rate of return on the associated investments.

Both the lower court and the PSC, however, maintain that neither the test year question nor the associated rate base issue are relevant to the case now before us. They maintain that the only issue presented by MDU's appeal is whether there is substantial evidence to support the PSC's decision to disallow some of the costs associated with the AVS II purchase as unreasonable. We agree that this is a correct statement of the issue.

The legislature has endowed the PSC with full power of

supervision, regulation, and control of public utilities in matters related to rates and service. See 69-3-101, et. seq. Under § 69-3-303, MCA, the legislature has mandated that before the PSC can approve any rate increase, it must hold a public administrative hearing. At this hearing, the MCC may become a party and following submission of all of the evidence, the PSC must issue a decision and order. Section 69-3-303, MCA. The PSC, in its order, may "fix and order substituted . . . rates, tolls, charges or schedules as are just and reasonable" upon finding that previous or proposed rates are unreasonable. Section 69-3-330(1), MCA.

This statutory scheme is based upon and is often followed by policies which have been enunciated by commentators and the courts. Professor A.J.G. Priest in Principles of Public Utility Regulation (1969) states that:

> "a regulatory agency cannot lawfully ignore the necessary, fair and reasonable expenses of operation incurred in the rendition of service . . . but must . . . allow all such expenses constituting charges on income . . ." (Emphasis added.) Id at 50.

Similarly, this Court has stated:

> A function of the PSC, in fulfilling its duty to supervise and regulate the operation of MDU, as an electric utility, is to see that MDU's rates are just and nondiscriminatory (cites omitted). In complying with this obligation, it follows that the PSC must scrutinize and review the operating expenses of MDU to prevent unreasonable costs from being passed to the customer. (Emphasis added.)

Montana-Dakota Utilities Co. v. Bollinger (1981), 632 P.2d 1086, 1089, 38 St.Rep. 1221, 1224.

Both the PSC and the MCC argue that the actions taken in this

9

case, i.e. disallowing a portion of the costs associated with AVS II, fully comply with the statutory mandate of § 69-3-330(1), MCA, and the reasoning of legal commentators and the Montana Supreme Court. We agree that the PSC has both the constitutional and statutory authority to review rates and to disallow rates which are proven unreasonable. Moreover, in accomplishing this task, the PSC need not determine that the company's actions are unreasonable. Their task is only to review rates and determine whether they are reasonable to the consumer. We must, therefore, now review the evidence presented to the PSC in order to determine whether it was justified in denying MDU's proposed rate increase.

We have previously set out much of the evidence relied upon by the PSC in our statement of facts. However, for the sake of clarity, we will repeat much of this evidence and apply it to the standard of review which must be utilized in this case in order to determine whether there is substantial evidence to support the PSC's order.

In its findings of fact and conclusions of law, the PSC summarized and analyzed the testimony given at the public hearing and the records submitted by MDU. This information led the Commission to conclude that MDU was, in point of fact, replacing inexpensive electricity which could be generated internally or acquired from MAPP with very expensive AVS II power. When the total operation and maintenance expenses of AVS II power were taken into account, it became apparent that it cost up to 261 percent more to operate than MDU's existing plants. In the opinion of

10

MCC's expert, Mr. Clark, the ratepayers should not be saddled with such power supply costs.

His opinion, it was found, was bolstered by MDU's own records which indicated that subsequent to the AVS II purchase, MDU had backed down production at its existing plants, decreased its use of purchased power from MAPP and increased its unregulated off system sales to other utilities.

In order to come up with a compromise that was fair to both the consumer and MDU, the PSC adopted Mr. Clark's proposal that MDU's energy resources be "remixed." This proposal assumed that MDU could acquire Schedule E and Schedule H energy from MAPP and that it could utilize them as a cost reducing mechanism. Evidence was presented of abundant power and energy. In fact it was shown that there is a surplus in MAPP until at least 1995. Moreover, MDU's own records suggested that it could utilize 139,288 mwh of Schedule E energy. This fact indicates that the company had this much power from its own units to forego, because in order to qualify for Schedule E purchases, a company must have excess energy to meet peak customer demand. Mr. Clark's proposal, which actually reflects less Schedule E energy than MDU's own records indicates it could acquire, is a feasible alternative to the dilemma.

In making its final decision it is obvious that the PSC chose to accept Mr. Clark's suggested alternative. It based its conclusion upon evidence found within the record, which was presented by both sides to the controversy. Obviously in accepting this testimony, the PSC chose to reject expert testimony presented

by MDU. However, such a decision was clearly within its discretion. As we stated in Dept. of Public Service Regulation v. Montana Irrigators (1984), 209 Mont. 375, 381, 680 P.2d 963, 966:

> Rate structuring involves highly specialized theories of economics. The weighing and balancing of expert opinion pro and con is properly vested in the administrative agency in its field of expertise.

In view of the facts presented and their application to the standard of review presented by utility rate cases, we hold that the PSC's denial of a portion of the costs associated with the AVS II purchase was not beyond its constitutional or statutory power. Nor was the decision based upon a mistake of law. We also cannot say the decision of the PSC was arbitrary in this case. The order of the District Court upholding the PSC's order is therefore affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____
Justices

_____
District Judge Thomas McKittrick
sitting for Justice John C. Sheehy

_____
District Judge C.B. McNeil
sitting for Justice Wm. E. Hunt, Sr.

12

Justice Fred J. Weber dissents as follows:

I do not dissent from the legal principles cited and applied in the majority opinion. There is no conflict between the parties as to those legal principles.

My problem is with the required purchase by MDU of 41 megawatts of power in each year. In 1981 MDU entered into an agreement with Basin Electric which obligated MDU to purchase 41 megawatts of power from a particular generating plant in which Basin Electric had an interest, and which also obligated Basin Electric to furnish that 41 megawatts for each of ten years. It is important to note that the Basin Electric power plant did not become operational until June of 1986. Under its determination, the PSC denied MDU the recovery of $1,474,932 in costs it incurred in agreeing to purchase the 41 megawatts of power for one year.

All parties agree that the PSC has the power to disallow unreasonable expenses. My contention is that the PSC improperly used that power in the present case.

The PSC relied upon the expert testifying in behalf of the Montana Consumer Council (MCC). It is critical to keep in mind that the MCC expert conceded that MDU needed its generating resources including the 41 megawatts of power each year contracted for with Basin Electric. The expert conceded that the power was reasonably needed for the forecasted consumer demands of MDU. The expert conceded that the power was reasonably needed for the forecasted consumer demands of MDU. We may therefore conclude that

13

both the MCC and the PSC agreed that it was both reasonable and necessary for the MDU to enter into the 1981 agreement for the obligated purchase of 41 megawatts each year starting at the completion of construction of the power plant in 1986. That aspect was not considered in the PSC determination nor in the majority opinion.

The MCC expert attacked only the amount which MDU was required to pay in one year for the 41 megawatts of power. The expert emphasized that MDU reduced some of its owned production of power which resulted in an increased cost to the consumer because the contracted price for the 41 megawatts exceeded the cost of production in certain of the MDU units. In addition, the expert testified that in 1985 MDU could have purchased cheaper power from a power pool at a rate substantially less than the price paid for the Basin Electric 41 megawatts. The substance of this testimony was that MDU could have generated power and purchased power at prices cheaper than paid to Basin Electric. As a result, the expert testified that it was proper to disallow $1,474,932 as an unreasonable expense--even though that amount was required by contract to be paid by MDU. That is a "catch-22" position of the worst sort so far as MDU is concerned. The result of this approach is that the PSC in substance commends MDU for obligating itself to purchase the 41 megawatts of power each year for 10 years--because that is a reasonable protection so far as consumer requirements are concerned. The "catch-22" result is that the PSC then says-- however, as we review this case in hindsight, we find that in

actual fact you didn't need that power as you anticipated because you could have purchased the power from other sources at a cheaper rate, and we therefore will disallow your required payment as an unreasonable expense.

The "catch-22" situation is further emphasized by the very nature of the "Pool power." MDU is a member of Mid-Continent Area Power Pool from which it can acquire power. Its membership in that Power Pool is conditioned upon a contractual arrangement which requires that MDU have its own generating capacity equal to its customers' demands plus a reserve of 15%. By signing the contract with Basin Electric, MDU has helped to establish its capacity to purchase the pool power by establishing a reserve above projected customer demands of 15%. The penalty result of the PSC determination is that while MDU must have 15% more than is needed for its consumer demands to purchase power from the Power Pool; the PSC will use the cheap power purchased from the Power Pool as a means of eliminating the right of MDU to include the Basin Electric contract price. In addition, pool power is not guaranteed power as is the power which must be furnished by Basin Electric. It is easy to look back and state that pool power was available, but difficult, if not impossible, to look ahead and count upon its availability. Truly a "catch-22."

As well stated in the majority opinion, the PSC may fix rates which are "just and reasonable." As stated by Professor A.J.G. Priest in the majority opinion, a regulatory agency cannot lawfully ignore necessary, fair and reasonable expenses of operation. In

15

addition, as stated by this Court in Montana Dakota Util. Co. v. Bollinger (Mont. 1981), 632 P.2d 1086, 38 St.Rep. 1221, in complying with its duty to supervise and regulate, the PSC must scrutinize and review operating expenses to prevent unreasonable costs from being passed to the consumer. Both the majority opinion and the dissent agree that the foregoing standards control. My contention is that the result reached by the PSC is neither just, fair, nor reasonable.

The technique used by the MCC, and accepted by the PSC, has resulted in an artful bypass of a fair and reasonable determination. In order to obtain such a fair and reasonable determination, I believe it essential that the PSC determine whether or not it was fair and reasonable that MDU enter into its 1981 ten year contract with Basin Electric. Such a procedure would require that the PSC make a decision as to whether or not the contract was fair and reasonable before disallowing any of the payments required under the contract. That was not done here. Instead the technique used was to attack the payment required in one year as being an unreasonable expense because power could have been obtained from other sources at a lesser cost. That hindsight was applied five years after the contract had been signed. If that same technique were followed during each of the remaining nine contract years of the MDU-Basin Electric contract, it becomes possible that the PSC could disallow the entire contract purchase price as being an unreasonable expense. This allows an after-the-fact determination on the part of the PSC which is not either fair

or reasonable. If the power supply during the ten year contract term is such that the 41 megawatts of power are needed for customers of MDU because power is in short supply, then MDU will be commended, and its purchase price of the 41 megawatts of power will be allowed as a reasonable expense. On the other hand, if power continues to be in surplus during the contract term as was true in 1985, then this would allow the PSC to disregard the required purchase price of the 41 megawatts of power in each year in which there was a surplus of power. Such procedure disregards the nature of the MDU-Basin Electric contract. That contract requires the furnishing of power and the purchase of power in a manner which is actually comparable to an investment by MDU in the construction of its own power generating facility. The payment under the contract should be treated in a manner comparable to the investment in plant, not by the devise used in the present case.

I conclude that the PSC has failed to fix rates that are just and reasonable because it ignored the necessary, fair and reasonable expenses of operation of MDU. I would remand for a redetermination of the rates here involved.

Justice

Justice Diane G. Barz and Justice John C. Harrison concur in the foregoing dissent.

Justices