JUSTICE McDONOUGH
delivered the Opinion of the Court.
Montana Dakota Utilities Co. (MDU) appeals an order of the Fifteenth Judicial District, Roosevelt County, which affirmed an administrative rate order of the Public Service Commission (PSC). In that order, the PSC denied full recovery of costs incurred by MDU, through a purchase of firm power from the Antelope Valley Station II (AVS IT) power plant. We affirm.
The sole issue on appeal is:
Was the District Court correct in affirming the PSC’s decision to reprice, for ratemaking purposes, the amount of the expense that MDU could recover from its Montana ratepayers for power purchased from AVS n?
MDU is a regulated public utility providing natural gas and electric service in Montana, South Dakota and Wyoming. To meet its customers’ demand for electric service, MDU owns, either individually or in partnership with other utilities, a number of generating stations located in or near its service territory. It is also a member of the Mid-Continent Area Power Pool (MAPP) from which it can acquire power under certain limited circumstances. MDU’s membership in MAPP is contractual, and it is conditioned upon MDU having its own generating capacity equal to customer demand plus a reserve of fifteen percent.
MDU is experiencing a steadily increasing demand for electricity. To meet that demand, MDU has been acquiring modest amounts of generating capacity as it becomes available. In 1986, pursuant to a contract made in 1981, it purchased forty-one megawatts of firm power from AVS II, a power plant which is owned by Basin Electric. Firm power is power which the seller is obligated to provide for a fixed number of years. Correspondingly, the buyer is obligated to make the purchase. The contract between MDU and Basin Electric provided the firm power purchases would be made over a ten year period. In addition to the AVS II purchase, MDU acquired additional power through purchases of additional generating resources.
*494 In order to recover costs associated with these acquisitions, MDU filed an application with the PSC seeking authority to increase its electric rates. In the application, the company prepared a cost of service which was based upon an historic test year, in this case 1985. The application also reflected the actual costs MDU incurred in purchasing forty-one megawatts of firm power from AVS II.
Following MDU’s filing, the Montana Consumer Counsel (MCC) intervened on behalf of Montana Ratepaying Consumers. At a public hearing, the MCC presented testimony from its expert, Albert Clark. Mr. Clark testified as to the effect of the AVS II purchase. In his testimony, he stated that MDU, through its purchase from AVS II, effectively replaced cheap power which could be generated at its existing plants with very expensive AVS II power. He noted, in this regard, that the average cost of energy produce at MDU’s existing plants ranged between $13.52 to $24.74 per megawatt hour (mwh). The cost of AVS II power, meanwhile, equaled $48.84 per mwh.
Mr. Clark further testified, that most of the energy produced by AVS II could have been generated internally at MDU’s existing plants. Relying upon this testimony, the PSC found that although AVS II was not purchased for the purpose of replacing existing facilities, that is in fact what happened because 77 % of the newly acquired energy could have been generated at existing facilities.
He said the net effect of this acquisition was to replace 88,750 mwh of existing energy production with more expensive AVS II power. The purchase also allowed MDU to increase off system sales to other utilities by 45,172 mwh. And finally, the AVS II acquisition replaced 64,638 mwh of Schedule E energy, which is purchased from MAPP.
Schedule E is cheap energy which is generally purchased in order to replace more expensive energy produced by an individual power company. It is not a reliable source of power, however, because the seller can cancel the sale with a one day notice. In order to be eligible to purchase Schedule E, an individual power company must be capable of meeting its baseload requirements and have a fifteen percent surplus to meet peak demand.
Clark stated that the AVS II acquisition actually replaced existing power sources with very expensive energy. He therefore maintained that it was unfair to saddle the consumer with the full cost of AVS II. He, therefore, sought to “remix” the company’s power supply figures in order to come up with a rate that was fairer to the consumer.
Mr. Clark accomplished this task by repricing the AVS II power according to an alternative energy scenario. In his proposal, the electric rates were figured as if:
*495 “(1) Base load energy generation at MDU’s existing facilities were increased to pre-AVS II levels. This course of action, he maintained, prevented the replacement of inexpensive power with very expensive AVS II power;
“(2) The increased off-system sales were not imputed to the consumers;
“(3) MAPP Schedule H energy was purchased in order to replace some of the energy produced by AVS II. Schedule H energy is relatively inexpensive energy which could be used by MDU well into the future, because there is a substantial surplus; and
“(4) Remaining energy needs were satisfied through purchases of Schedule E energy from MAPP.”
Initially, the PSC rejected Clark’s proposal and granted a rate increase, but at a level lower than MDU requested. The PSC based its action partly upon Clark’s suggested use of Schedule E energy. As stated above, Schedule E is not a dependable energy source because it can be canceled on one day’s notice. Therefore, in order to avail itself of the power, a utility company must have energy to forgo. The PSC, upon reviewing Clark’s proposal, determined that he was treating Schedule E as a long-term source of energy. Due to its limitations, Schedule E cannot be used as a dependable source of power, and therefore it concluded that Clark’s proposal was not feasible.
Following this decision, both the MCC and MDU submitted motions for reconsideration. In its motion, the MCC argued that the PSC misinterpreted Clark’s testimony. It maintained that MDU’s own power supply figures indicated that MDU could utilize 139,288 mwh of Schedule E energy. The MCC maintained that these figures indicated that MDU had energy to forgo prior to the AVS II purchase and therefore was able to avail itself of the cheaper energy. Obviously, if MDU had excess energy before the AVS II acquisition, it had to have extra energy following its purchase. The MCC therefore maintained that it was not treating Schedule E as a long-term energy source, but was instead, treating it exactly as it is supposed to be, namely a source of low cost energy which is purchased to displace higher cost energy.
Upon reconsideration, the PSC agreed that it misinterpreted the information contained in Mr. Clark’s testimony. It concurred that his proposal treated Schedule E energy correctly and that this treatment made the AVS II adjustment acceptable. It therefore granted the MCC’s motion and further reduced the level of the rate increase.
MDU then appealed the matter to District Court. The District Court *496 affirmed the PSC’s order and specifically found that it acted properly in “repricing” AVS II energy because MDU’s own numbers established that it did not need to incur the expense to meet present or future demand. It further found that a portion of the expense incurred through the AVS II acquisition was unreasonable and therefore should not be passed on to the consumer. This appeal followed.
In utility rate cases this Court has traditionally held itself bound by a very strict standard of review. In previous cases we have stated:
“... [T]his Court is always confronted in ratemaking cases with the question of how far the court can go in interfering with, or directing the exercise of power, by an equal department of government. We have repeatedly held that there will be no interference with the orders of the Commission unless:
“(1) they go beyond the power constitutionally given; or
“(2) beyond their statutory power; or
“(3) they are based on a mistake of law.
“Cascade County Consumers Ass’n v. Public Service Comm’n (1964), 144 Mont. 169, 192, 394 P.2d 856, 868; Mountain States Telephone and Telegraph v. Department of Public Service Regulation (1981), 191 Mont. 331, 339, 624 P.2d 481, 485.”
This strict standard of review is necessitated by the nature of controversies surrounding utility rate cases. These cases are generally very complicated and involve the review and interpretation of testimony given by experts in fields such as engineering and economics. The PSC, because of its expertise and familiarity with these types of cases, is best suited to review the evidence presented by such testimony and make the decisions. In light of this fact, this Court has traditionally refused invitations to substitute its judgment for that of the PSC.
In rate cases, the PSC is the judge of fact and this Court only determines questions of law. In deciding questions of law, our review only requires us to determine “whether the PSC acted arbitrarily and unreasonably without sufficient evidence to support its findings or exercised its authority unreasonably or set the rates so low that they are confiscatory and deprive the utility of its property without due process of law.” Montana-Dakota Utilities v. Department of Public Service Regulation (1988), 231 Mont. 118, 752 P.2d 155. This standard of review, which has been described in case law, has its origins in the Montana Administrative Procedure Act. Under this act, findings of fact are subject to a “clearly erroneous” standard of review, while conclusions of law are subject to an “abuse of *497 discretion” standard of review. Section 2-4-101, MCA, et seq.
MDU maintains that the PSC acted unlawfully by limiting its determination of the need for AVS II power to the 1985 test year and by “repricing” the AVS II power without any determination that the company acted imprudently or unreasonably. As for the first assignment of error, MDU maintains that the AVS II purchase should be considered a long-term investment which should be included in the rate base. Usually, items which are considered to be rate base expenditures include new power plants, transmission lines, etc. If the utility can prove that such facilities are “used and useful” they are entitled to earn a rate of return on the associated investments.
Both the lower court and the PSCfc however, maintain that neither the test year question nor the associated rate base issue are relevant to the case now before us. They maintain that the only issue presented by MDU’s appeal is whether there is substantial evidence to support the PSC’s decision to disallow some of the costs associated with the AVS II purchase as unreasonable. We agree that this is a correct statement of the issue.
The legislature has endowed the PSC with full power of supervision, regulation, and control of public utilities in matters related to rates and service. See 69-3-101, et. seq. Under sec. 69-3-303, MCA, the legislature has mandated that before the PSC can approve any rate increase, it must hold a public administrative hearing. At this hearing, the MCC may become a party and following submission of all of the evidence, the PSC must issue a decision and order. Section 69-3-303, MCA. The PSC, in its order, may “fix and order substituted ... rates, tolls, charges or schedules as are just and reasonable” upon finding that previous or proposed rates are unreasonable. Section 69-3-330(1), MCA.
This statutory scheme is based upon and is often followed by policies which have been enunciated by commentators and the courts. Professor A.J.G. Priest in Principles of Public Utility Regulation (1969) states that:
“a regulatory agency cannot lawfully ignore the necessary, fair and Reasonable expenses of operation incurred in the rendition of service ... but must ... allow all such expenses constituting charges on income...” (Emphasis added.) Id. at 50.
Similarly, this Court has stated:
“A function of the PSC, in fulfilling its duty to supervise and regulate the operation of MDU, as an electric utility, is to see that MDU’s rates are just and nondiscriminatory (cites omitted). In *498 complying with this obligation, it follows that the PSC must scrutinize and review the operating expenses of MDU to prevent unreasonable costs from being passed to the customer.” (Emphasis added.)
Montana-Dakota Utilities Co. v. Bollinger (1981), [_Mont. _,] 632 P.2d 1086, 1089, 38 St.Rep. 1221, 1224.
Both the PSC and the MCC argue that the actions taken in this case, i.e. disallowing a portion of the costs associated with AVS II, fully comply with the statutory mandate of sec. 69-3-330(1), MCA, and the reasoning of legal commentators and the Montana Supreme Court. We agree that the PSC has both the constitutional and statutory authority to review rates and to disallow rates which are proven unreasonable. Moreover, in accomplishing this task, the PSC need not determine that the company’s actions are unreasonable. Their task is only to review rates and determine whether they are reasonable to the consumer. We must, therefore, now review the evidence presented to the PSC in order “to determine whether it was justified in denying MDU’s proposed rate increase.
We have previously set out much of the evidence relied upon by the PSC in our statement of facts. However, for the sake of clarity, we will repeat much of this evidence and apply it to the standard of review which must be utilized in this case in order to determine whether there is substantial evidence to support the PSC’s order.
In its findings of fact and conclusions of law, the PSC summarized and analyzed the testimony given at the public hearing and the records submitted by MDU. This information led the Commission to conclude that MDU was, in point of fact, replacing inexpensive electricity which could be generated internally or acquired from MAPP with very expensive AVS II power. When the total operation and maintenance expenses of AVS II power were taken into account, it became apparent that it cost up to 261 percent more to operate than MDU’s existing plants. In the opinion of MCC’s expert, Mr. Clark, the ratepayers should not be saddled with such power supply costs.
His opinion, it was found, was bolstered by MDU’s own records which indicated that subsequent to the AVS II purchase, MDU had backed down production at its existing plants, decreased its use of purchased power from MAPP and increased its unregulated off system sales to other utilities.
In order to come up with a compromise that was fair to both the consumer and MDU, the PSC adopted Mr. Clark’s proposal that MDU’s energy resources be “remixed.” This proposal assumed that MDU could acquire Schedule E and Schedule H energy from MAPP *499 and that it could utilize them as a cost reducing mechanism. Evidence was presented of abundant power and energy. In fact it was shown that there is a surplus in MAPP until at least 1995. Moreover, MDU’s own records suggested that it could utilize 139,288 mwh of Schedule E energy. This fact indicates that the company had this much power from its own units to forego, because in order to qualify for Schedule E purchases, a company must have excess energy to meet peak customer demand. Mr. Clark’s proposal, which actually reflects less Schedule E energy than MDU’s own records indicates it could acquire, is a feasible alternative to the dilemma.
In making its final decision it is obvious that the PSC chose to accept Mr. Clark’s suggested alternative. It based its conclusion upon evidence found within the record, which was presented by both sides to the controversy. Obviously in accepting this testimony, the PSC chose to reject expert testimony presented by MDU. However, such a decision was clearly within its discretion. As we stated in Dept of Public Service Regulation v. Montana Irrigators (1984), 209 Mont. 375, 381, 680 P.2d 963, 966:
“Rate structuring involves highly specialized theories of economics. The weighing and balancing of expert opinion pro and con is properly vested in the administrative agency in its field of expertise.”
In view of the facts presented and their application to the standard of review presented by utility rate cases, we hold that the PSC’s denial of a portion of the costs associated with the AVS II purchase was not beyond its constitutional or statutory power. Nor was the decision based upon a mistake of law. We also cannot say the decision of the PSC was arbitrary in this case. The order of the District Court upholding the PSC’s order is therefore affirmed.
CHIEF JUSTICE TURNAGE and HON. THOMAS McKITTRICK, District Judge, sitting for JUSTICE SHEEHY, and HON. C.B. McNEIL, District Judge, sitting for JUSTICE HUNT, concur.